**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**ENTERED
01/26/2011**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **HILLARY DURGIN HARMON,** | § | **Case No. 10-33789** |
| Debtor(s). | § | |
| | § | **Chapter 11** |
| | § | |
| **HILLARY DURGIN HARMON,** *et al*, | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **Adversary No. 10-03207** |
| | § | |
| **LIGHTHOUSE CAPITAL FUNDING,** | § | |
| **INC.,** | § | |
| Defendant(s). | § | **Judge Isgur** |

## <u>MEMORANDUM OPINION</u>

The Court denies Lighthouse's motion for reconsideration (ECF No. 87) of the Court's order imposing an evidentiary sanction against Lighthouse. However, Lighthouse's argument that "the Court failed to provide a clear factual or legal basis for imposing such a severe sanction against [Lighthouse]" should be appropriately addressed. Although the Court did provide the basis for its sanction when it was issued on the record on November 19, 2010, the Court appreciates Lighthouse's desire for greater specificity. Accordingly, for the reasons set forth in detail below, the Court finds that its November 19, 2010 sanction of Lighthouse was appropriate, given Lighthouse's unremitting abuse of the discovery process. Pursuant to Federal Rule of Bankruptcy Procedure 7037, the Court properly made an adverse finding that Lighthouse never established the escrow account required by its loan agreement with the Harmons.[1]

---

[1] Because the Court deemed the absence of the establishment of the escrow account, the facts surrounding the alleged establishment of the escrow account have never been fully litigated. This Memorandum Opinion assumes, without deciding, that the bank statements provided by Lighthouse on November 11, 2010 were for an escrow account that would have complied with the loan agreement between the parties.

**Background**

To fully understand the basis for the Court's sanction, it is necessary to review the complete history of this case. This history includes Lighthouse's failure to (i) search its internal records for discoverable information, (ii) produce documents controlled by its attorneys, (iii) timely produce all relevant documents during discovery, and (iv) produce Escrow Account bank statements that Lighthouse was ordered and agreed to produce (after Lighthouse failed to initially produce them). Lighthouse's conduct wasted the Harmons' and the Court's time and resources, and greatly distorted the facts of this case. Moreover, on numerous occasions, Lighthouse offered unreasonable and inaccurate justifications for its conduct. It is this behavior, taken in total, that merits the adverse factual finding against Lighthouse pursuant to Rule 7037.[2]

**1. Initial Stages of the Litigation**

Debtor Hillary Harmon and her husband, Murphey Harmon, initiated this lawsuit against Lighthouse Capital Funding, Inc. in state court on April 16, 2010. *See In re Harmon*, 2010 WL 4273078, at *1 (Bankr. S.D. Tex. Oct. 22, 2010). Hillary Harmon then filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of Texas on May 4, 2010. *Id.* The Harmons removed the lawsuit against Lighthouse to this Court on May 10, 2010. *Id.*

On July 8, 2010, the Harmons filed their First Amended Complaint ("Complaint") in this adversary proceeding. *Id.* The allegations in the Complaint arose out of a mortgage refinancing transaction between the Harmons and Lighthouse. *Id.* Specifically, on April 18, 2008 Lighthouse provided a one year loan in the total amount of $1,268,598.87 to the Harmons. *Id.* The loan was secured by a mortgage on the Harmons' homestead. *Id.* Under the relevant terms of the loan agreement, $177,715.83 of the $1,268,598.87 was to be held in an escrow account

---

[2] The most continuous and egregious abuses were related to Lighthouse's failure to produce Escrow Account bank statements. As discussed below, since Lighthouse repeatedly failed to produce the Escrow Account bank statements, the Court finds that a sanction declaring the non-existence of the Escrow Account is appropriate.

("Escrow Account"), and a portion of the $177,715.83 was then to be applied each month towards the Harmons' monthly interest payment:

> As a consideration for providing you with a payment plan, the sum of $177,715.83 ("Funds") will be placed in escrow in a federally insured account in the name of the holder of the Loan (transferable as is necessary to said holder's servicing agent) and will be utilized to make the interest payments due during the period commencing on the first payment date specified in the Note evidencing the Loan ("Note") and ending on the Maturity Date . . . .

*Id.*

The Harmons' Complaint asserted numerous causes of action against Lighthouse.[3] Those claims are largely irrelevant for the purposes of this opinion. Instead, as set forth below, the Court's focus is primarily upon Lighthouse's conduct with regard to the maintenance of and production of documents related to the Escrow Account.

### 2. Discovery Deadline

On July 1, 2010, the Court issued a Case Management Order (ECF No. 11). In order to accommodate the parties' request, the Court established an expedited pre-trial period.[4] Among other things, the Case Management Order provided that the "*deadline for completion of discovery [was] August 2, 2010.*" *Id.* (emphasis added). The order also set an August 10, 2010 trial date. *Id.*

### 3. August 10, 2010 Trial

Trial began as scheduled on August 10, 2010. Multiple issues arose during trial concerning Lighthouse's incomplete document production. The testimony and discussions

---

[3] The Harmons' Complaint asserted claims against Lighthouse for fraud, usury, deceptive trade practices, negligent misrepresentation, conversion, theft, unreasonable collection practices, and negligent debt collection. *Id.* In addition to damages, the Harmons sought a declaratory judgment that the Lighthouse mortgage constitutes an illegal home equity loan that is void under Texas law. *Id.*

[4] Due to issues beyond the scope of this opinion (largely concerning the sale of the Harmons' homestead), both parties expressed their desire for a quick resolution of this adversary proceeding and both parties agreed to the expedited schedule for discovery and trial.

concerning these issues, set forth in detail below, revealed Lighthouse's disregard for the discovery process.

### a.  Lighthouse's Failure to Produce Escrow Account Bank Statements

First, the Harmons' informed the Court that Lighthouse had failed to produce bank statements from the Escrow Account, despite the Harmons' explicit request for all documents relating to their loan.  Trial Tr. vol. 2, 14:14-21, Aug. 10, 2010.  The Court and the parties then engaged in the following colloquy on the record concerning the production of the Escrow Account bank statements:

**Harmons' Counsel (Mr. Simon):**

> First of all, there is an escrow account that is being maintained by Lighthouse somewhere, according to the testimony of -- the deposition testimony of Mr. Leshgold.[5]  In our original subpoena that we issued to them, we asked for documents in any way shape or form relating to the loan in question.
>
> We -- last week we sent an email on Wednesday asking for specifically the [Escrow] [A]ccount statements.  There are five account statements for this [Escrow] [A]ccount where allegedly these monies went into -- this interest reserve went into.  We received word back verbally from Counsel for the Defendants -- Defendant, Mr. Badger, that he was not going to produce those, that -- well, it wasn't clear whether he was or he wasn't going to produce them.  He said he was disinclined to produce them.  He was going to talk to his client to see whether they could find them.  It never got resolved.
>
> So the very next day I issued a second subpoena and this time I specifically asked for those account statements and I asked that they be produced here this morning.  I think I'm entitled to them.  I think they should have been produced earlier.  Certainly pursuant to the subpoena that I issued last Thursday, they should have been produced here today and I have not received them.

---

[5] Mr. Leshgold is the current president and chairman of the board of Lighthouse.  He is also an owner and the former CEO of Lighthouse.

**Lighthouse's Counsel (Mr. Badger):**

> Your Honor, this is discovery outside the Court's own pretrial order. We reviewed the subpoena that was served upon me, not Mr. -- not my client, not Gary [Leshgold] but on me, the first subpoena. We produced documents. The Plaintiff has known from day one about the escrow agreement and the escrow account. He's known that through the last three litigations in State Court. There was no specific request in the subpoena with respect to those statements.

> I was then served outside of the Court's [discovery deadline] on Friday again on behalf of Gary to get those records. Those records are 2008 bank records which are off-site. We have -- he attempted to get them and couldn't get them. What we did get, your Honor, were business records with respect to the account, a QuickBooks statement and the account being at Pacific Mercantile Bank which is the account that he testified to in his deposition. If these requests had been done in -- July 1, it would have given us more time to do it. We didn't get them until right before his deposition. We produced documents. To the extent they weren't there, we got no objections.

> We're not here ready to have a pretrial fight over discovery, your Honor, and we believe it's outside the Court's own order. I do have this memo and I do have these records that were produced by Mr. Leshgold Friday and over the weekend. They're not the exact bank statements but it tracks the payments in the escrow account to which he testified.
> . . .

**The Court:**

> Let me see your request for production. Did you send one?

**Harmons' Counsel (Mr. Simon):**

> I certainly did, your Honor. This is the original subpoena, your Honor, Harmon Exhibit 46 and this is the second subpoena that was issued, Harmon Exhibit 48. I believe that the account statements would have been covered under Item Number 1.[6] There was no objection to the subpoena duces tecum.

---

[6] Item Number 1 requested "All documents related to the [Harmons'] loan . . . ." Harmons' Ex. 46.

**The Court:**

Why aren't they covered by Number 1, Mr. Badger?

**Lighthouse's Counsel (Mr. Badger):**

Your Honor, they requested documents related to the loan. This is a separate escrow and arranged -- it's entitled "Escrow Arrangement and Agreement" --

**The Court:**

So it's not related to the loan?

**Lighthouse's Counsel (Mr. Badger):**

-- related to an escrow account.

**The Court:**

It's not related to the loan?

**Lighthouse's Counsel (Mr. Badger):**

Well, we take the position that that specific request is not covered by the subpoena. They've known about the escrow account and could simply have asked for documents for the escrow account and chose not to.

**The Court:**

It's not related to the loan?

**Lighthouse's Counsel (Mr. Badger):**

The escrow account is the interest reserve.

**The Court:**

It's not related to the loan? Is that what you're telling me or it is related to the loan?

**Lighthouse's Counsel (Mr. Badger):**

Well, we take the position that under the subpoena, it's not covered, not related the loan, no.

**The Court:**

That's not my question.  You know my question.

**Lighthouse's Counsel (Mr. Badger):**

That's correct, Judge. It's not related to the loan.

**The Court:**

The escrow is not related to the loan?

**Lighthouse's Counsel (Mr. Badger):**

Well, it's related to the loan in the respect that it is an escrow arrangement and agreement.   The escrow arrangement and agreement document was produced.  What was not produced were the --

**The Court:**

Is the escrow account related to the loan?  It's not a hard question.

**Lighthouse's Counsel (Mr. Badger):**

All right.  It's related to the interest reserve account.  Yes, your Honor, it is.  In that respect, it is.

**The Court:**

Okay. Well, then you needed to produce the documents. Why didn't you?

**Lighthouse's Counsel (Mr. Badger):**

Your Honor, when we got the request at the deposition, we attempted to go offsite for their 2008 records.  We were asked for those documents on Wednesday at Mr. Leshgold's deposition.  We talked about it.  We tried to go offsite and get them and couldn't get them under such short notice.  What we were able to produce is what they had in their computer which are the QuickBooks ledger and the documents that we've submitted.

**The Court:**

What relief do you want, Mr. Simon?

**Harmons' Counsel (Mr. Simon):**

> Your Honor, I want you to carry this along because I think there
> are other discovery abuses that have occurred in this case that I'm
> not prepared to discuss at this particular time.

*Id.* at 14:16-18:25.

When confronted with the question of whether the Escrow Account bank statements were "related to" the Harmons' loan, Lighthouse's answers repeatedly evaded the Court's simple question. It was not until after the Court reiterated the question for the seventh time that Lighthouse acknowledged the relationship between the Harmons' loan and the Escrow Account. Lighthouse could have easily admitted that it made a mistake in failing to produce the Escrow Account statements. The Escrow Account—which was to be established with proceeds of the Harmons' loan for the purpose of making monthly interest payments on the loan—was obviously related to the Harmons' loan. However, instead of taking responsibility for its inaction, Lighthouse took the unreasonable position that the Harmons were at fault for the non-production because they did not explicitly request the Escrow Account statements.[7]

After Lighthouse conceded the relationship between the Escrow Account and the Harmons' loan, the Court asked Lighthouse why it failed to properly comply with the Harmons' discovery requests. Lighthouse responded that it did not have enough time to produce the bank statements.

This response was unreasonable—Lighthouse may not request an expedited pretrial and discovery period only to claim that it did not have adequate time to comply with reasonable discovery requests. The first subpoena was issued on July 19, 2010. Other than its blanket

---

[7] It is true that the request could have been more specific. Nevertheless, as set forth below, any ambiguity was promptly clarified by the Harmons' second document request.

assertion, Lighthouse provided no explanation as to why three full weeks (before trial) was an insufficient amount of time for providing the Escrow Account statements.

It is apparent that Lighthouse did not make any effort whatsoever to produce the Escrow Account statements after the issuance of the first subpoena on July 19, 2010.  Lighthouse's excuse that it lacked sufficient time to produce the Escrow Account statements was offered in response to the Harmons' second subpoena, which explicitly requested the missing Escrow Account statements.  The second subpoena was issued after the August 2, 2010 discovery deadline had passed, but merely clarified the obvious.  Nevertheless, Lighthouse did not mention any actions taken, after the issuance of the first subpoena, for the purpose of locating or producing the Escrow Account bank statements.  The Court concludes that Lighthouse did not want to exert any effort to produce the Escrow Account statements and unilaterally chose to ignore the subpoenas as they related to the Escrow Account statements.

Moreover, assuming that Lighthouse did not initially consider the statements to be related to the loan, the Court finds it unlikely that Lighthouse could not readily access its own bank statements once the issue was explicitly raised by the Harmons.

It is true that if Lighthouse had made a diligent effort to comply with the subpoenas and had simply overlooked the escrow account statements, the Court would not be imposing a sanction as significant as a deemed finding of a material fact.  Accordingly, the Court will consider Lighthouse's non-production of the records in the appropriate context.

### b.  Mr. Leshgold's Failure to Respond to the July 19, 2010 Subpoena

The second discovery issue from the August 10, 2010 trial is the inaction of Mr. Leshgold, Lighthouse's president, upon receiving the Harmons' July 19, 2010 subpoena.  As the trial transcript demonstrates, Mr. Leshgold ignored the Harmons' request for production as it

related not just to the Escrow Account statements but to all documents requested in the subpoena:

**Harmons' Counsel (Mr. Simon):**

> When did you produce -- I'm going to digress for a moment -- when did you produce the documents in this case to Mr. Dyer?

**Mr. Leshgold:**

> I don't know.

**Harmons' Counsel (Mr. Simon):**

> Okay. When you received the subpoena duces tecum, the subpoena and the subpoena duces tecum that was issued to your counsel here sitting across from me on the 19th of July, did you review that subpoena duces tecum?

**Mr. Leshgold:**

> I'm not sure what a subpoena duces tecum is.

**Harmons' Counsel (Mr. Simon):**

> Let me hand you a copy of it. I'm going to hand you what has been marked for identification as Leshgold Exhibit 46.
> . . .

**Mr. Leshgold:**

> Yes, I've seen this document.

**Harmons' Counsel (Mr. Simon):**

> Okay.  And when did you review this?  When did you see it first?

**Mr. Leshgold:**

> You know, I don't know the exact date, but I received an e-mail -- it was attached to an e-mail from my attorney.

**Harmons' Counsel (Mr. Simon):**

> All right.  And did you look at the exhibits that were requested?

**Mr. Leshgold:**

> To be honest with you, *I glanced at it* and I didn't spend a ton of time reviewing it.

**Harmons' Counsel (Mr. Simon):**

> Did you spend any time reviewing it?

**Mr. Leshgold:**

> Yeah, *I certainly glanced at it*, yes.

**Harmons' Counsel (Mr. Simon):**

> Okay. *Did you attempt to go through your records to try to determine whether or not there were any documents responsive to this request*?

**Mr. Leshgold:**

> *No*.  We had already produced everything prior.

**Harmons' Counsel (Mr. Simon):**

> When did you produce it?

**Mr. Leshgold:**

> I don't know the date that it was produced.

**Harmons' Counsel (Mr. Simon):**

> To whom did you produce it?

**Mr. Leshgold:**

> We had given everything on this case in a prior discovery.  I don't know when it was done.  I'd given everything to Mr. Dyer and to our counsel at Robertson Anschutz.

**Harmons' Counsel (Mr. Simon):**

> Okay.  And do you know when that occurred?

**Mr. Leshgold:**

> I don't.

**Harmons' Counsel (Mr. Simon):**

> Okay. So, do I take it, then, that you did not make any independent effort to go through this document to determine whether there were any requests that were being made here that you hadn't previously responded to with this prior production?

**Mr. Leshgold:**

> Our counsel did that, I believe.

**Harmons' Counsel (Mr. Simon):**

> Okay. Did he come up to your office and go through the documents at your office?

**Mr. Leshgold:**

> No.

**Harmons' Counsel (Mr. Simon):**

> Well, what do you mean by your counsel did it?

**Mr. Leshgold:**

> We had produced everything that we had in relation to the Harmon case. There was nothing else that we had that was related to the case.

**Harmons' Counsel (Mr. Simon):**

> All right. Well, let me ask you this question. Did, for example, did you request documents that were in possession of your attorneys in Dallas[8] in producing the documents originally?

**Mr. Leshgold:**

> What attorney in Dallas are you referring to?

---

[8] When Harmons' counsel stated "attorneys in Dallas," he was referring to the law firm of Middleberg, Riddle & Gianna, who assisted Lighthouse in transacting the Harmons' loan.

**Harmons' Counsel (Mr. Simon):**

> The attorney that is on Exhibit 3 -- Harmon Exhibit 3 -- Marcia Williams. Did you request that she produce to you all documents that she had in her records so that you could produce them?

**Mr. Leshgold:**

> Not when I received this, no.

**Harmons' Counsel (Mr. Simon):**

> Okay. Did you do it previously?

**Mr. Leshgold:**

> I don't know.

**Harmons' Counsel (Mr. Simon):**

> Well, who would know?

**Mr. Leshgold:**

> My attorneys would know that answer.

**Harmons' Counsel (Mr. Simon):**

> Okay. So, which attorneys would know that?

**Mr. Leshgold:**

> That would be Pat Dyer and Mr. Badger and Charlotte Meyer and Ruth Harman (phonetic).

**Harmons' Counsel (Mr. Simon):**

> Okay. So, they're the ones that would know whether or not there was a request made from the law firm in Dallas -- the Milberg Riddle and DeAna (phonetic) law firm. Is that correct?

**Mr. Leshgold:**

> I believe so.

**Harmons' Counsel (Mr. Simon):**

> Okay. You have no idea whether or not those documents have been produced -- as we sit here today?

**Mr. Leshgold:**

> I don't know.

Trial Tr. vol. 1, 10:4-13:3, Aug. 10, 2010 (emphasis added).

Mr. Leshgold's testimony establishes that, "other than glanc[ing] at it," he took no action upon receiving the Harmons' July 19, 2010 subpoena. *Id.* Mr. Leshgold testified that his inaction was excused because Lighthouse had already produced "everything that [Lighthouse] had in relation to the Harmon case] during litigation that was previously pending in state court." *Id.* at 12:3-4. In retrospect, the Court finds that it has been conclusively established that this statement was factually incorrect. As will be discussed in detail below, Lighthouse has now produced over one thousand additional documents (compared to approximately 500 documents that were timely produced) since Mr. Leshgold made this inaccurate statement. Nevertheless, the Court also finds that the statement was prospectively unreasonable. Lighthouse made no effort to make a comprehensive production and did not even review its initial production (made in state court) to see if it complied with the subpoena. Thus, the production that occurred in pre-bankruptcy, state court litigation was incomplete and it was inappropriate for Mr. Leshgold to rely upon it.

Mr. Leshgold also testified to a lack of recollection as to whether Lighthouse ever attempted to produce, either in this proceeding or in state court, documents in the possession of their attorneys in Dallas—Middleberg, Riddle & Gianna ("Middleberg")—concerning the Harmons' loan. Middleberg possessed hundreds of non-privileged documents that had not yet been produced at the time Mr. Leshgold gave his testimony. Yet neither Mr. Leshgold nor any

other Lighthouse agent or representative ever made an effort to produce documents in Middleberg's possession. It was, therefore, incorrect for Mr. Leshgold to take the position that Lighthouse had previously produced all relevant documents during the state court litigation.

In essence, Mr. Leshgold's testimony makes clear that he received the subpoena and then ignored it. Mr. Leshgold may have believed that Lighthouse had already produced all relevant documents; however, his testimony establishes that any such belief was without any factual support. Lighthouse's attorneys either never instructed Mr. Leshgold with respect to his duties in responding to the subpoena or Mr. Leshgold ignored their instruction. In either event, Lighthouse is culpable for its failure to comply with the subpoena.

### c.   Lighthouse's Failure to Submit a Privilege Log

The third discovery issue from the August 10, 2010 trial concerns whether Lighthouse retained any documents on the grounds of privilege:

**Harmons' Counsel (Mr. Simon):**

> Take a look at [the subpoena marked as] Exhibit 46 and look at the last page, which is the documents to be produced.
> . . .
> And look at the last page.
> . . .
> And it says, "Please identify in a written response by date, author and recipient any document being withheld on the basis of any privilege and state the privilege being alleged."
> . . .
> Did you endeavor to prepare a privilege log of documents that you claimed were privileged as between you and your lawyers?

**Mr. Leshgold:**

> No.

**Harmons' Counsel (Mr. Simon):**

> Are there any other documents that are being retained by Lighthouse that would constitute attorney/client privilege documents?

**Mr. Leshgold:**

>Not that I'm aware of.

**Harmons' Counsel (Mr. Simon):**

>Okay.  Was there more than one communication that came from the law firm -- the Dallas law firm -- to you that you saw?

**Mr. Leshgold:**

>I don't know.

*Id.* at 13:4-15:1.

Mr. Leshgold's testimony indicated that Lighthouse was not withholding documents on the grounds of privilege.  As will be discussed below, Mr. Leshgold's testimony was incorrect. It was subsequently revealed that Lighthouse possessed privileged documents that were not timely produced.

### d.  Court's Inquiry and Production Order at the Conclusion of Trial

At the conclusion of the August 10, 2010 trial day, the Court discussed the additional document production that would be required of Lighthouse:

**The Court:**

>What remedy do you want about the account statements?  I think you're entitled to look at them.  I think you're entitled to ask questions about them.  What remedy are you looking for about them?

**Harmons' Counsel (Mr. Simon):**

>At a minimum, before the evidence is closed, I need to review those accounts.  I also need to review the records that are on -- in the possession of the law firm.  And I need to review the 11 pages that are missing or I need to find out where they are --
>. . .

**The Court:**

> So, what do you want to do about the Bates marking?

**Harmons' Counsel (Mr. Simon):**

> I want -- at a minimum, I'm going to have to at least talk to
> Mr. Dyer about it to find out what happened to these documents.
> . . .
>
> I'm also going to need the documents from the law firm.

**The Court:**

> Mr. Badger?

**Lighthouse's Counsel (Mr. Badger):**

> I am not aware of any documents from the -- I don't know what
> that inquiry is.  But with respect to the accounts, we will endeavor
> to get those, your Honor.
> . . .

**Harmons' Counsel (Mr. Simon):**

> What about the [Dallas] law firm?

**The Court:**

> I think inquiry needs to be made as to whether the law firm has
> documents that were not turned over.  If there are documents that
> weren't turned over, I'll let you then seek an appropriate remedy.
> But I agree; inquiry -- has inquiry been made of the law firm?

**Lighthouse's Counsel (Mr. Badger):**

> Of the Marsha Williams law firm, your Honor?

**The Court:**

> Correct.

**Lighthouse's Counsel (Mr. Badger):**

> With respect to documents --

**The Court:**

      Whether she has any documents.

**Lighthouse's Counsel (Mr. Badger):**

      -- and the subpoena?

**The Court:**

      I don't think he needed to send a separate subpoena duces tecum to the firm -- to the party's law firm.  The party was required to produce all documents under its possession or control, which includes documents held by the law firm.

**Lighthouse's Counsel (Mr. Badger):**

      And, your Honor, we produced a document that was privileged in state court.  I felt like I couldn't fall back and say the privilege now applies in federal court.  That was produced.

**The Court:**

      Right.

**Lighthouse's Counsel (Mr. Badger):**

      And the loan documents that she produced were produced, as well as the escrow agreement.  We believe that she has complied.

**The Court:**

      Well, the question is: Does she have more things in her file?

**Lighthouse's Counsel (Mr. Badger):**

      I don't believe so.  I'm happy to make that inquiry.

**The Court:**

      Well, inquiry needs to be made.

      . . .

**Harmons' Counsel (Mr. Simon):**

      And what about the 11 pages that are missing?

**The Court:**

> Well, you can make inquiry of Mr. Dyer, and if you're entitled to some remedy, you can seek it.  This is -- the first I've heard of that was today.  I don't have any motion about that.  But, obviously, if there's 11 pages that were withheld from you, you've got lots of remedies.   If there's 11 pages of Bates stamp errors, there's nothing to do; and if there's 11 pages that have been inadvertently lost, I don't know what the remedy is.

*Id.* at 60:12-65:7.

Thus, at the conclusion of the August 10, 2010 trial, there were three unresolved issues concerning Lighthouse's document production.  The first issue concerned the missing Escrow Account statements.  The Court ordered Lighthouse to produce the missing Escrow Account statements and Lighthouse's counsel stated that they would "endeavor" to do so.

The second issue pertained to the non-production of any documents in Middleberg's possession.  The Court informed Lighthouse's counsel that any documents in Middleberg's possession should have been produced in accordance with the subpoena issued on July 19, 2010.  Lighthouse's counsel responded that he believed the law firm had complied with the subpoena but agreed to make further inquiry.

The third issue concerned whether Lighthouse retained any privileged documents, without submitting a privilege log.

The Court continued the trial to September 2, 2010.

### 4.   The Middleberg Documents, Privilege Log and Lighthouse's Internal Email Files

The next stage of revelations concerning Lighthouse's conduct during discovery began after Lighthouse produced documents in the possession of its attorneys at Middleberg.  The production of those documents led to the disclosure that Lighthouse had failed to search its own internal email records for discoverable information.  This conduct was then exacerbated by

Lighthouse's failure to take responsibility, instead offering unreasonable and inaccurate rationalizations, for its inaction.

### a.  The Harmons' August 23, 2010 Motion to Compel

On August 23, 2010, the Harmons filed Plaintiffs' Emergency Motion to Compel Production of Allegedly Privileged Documents, For In Camera Inspection, and for Other Relief (ECF No. 34) ("Motion to Compel").  The Motion to Compel informed the Court that Lighthouse had produced hundreds of pages of documents that were in Middleberg's possession around August 20, 2010.  On that same day, Lighthouse had also produced a privilege log that contained a list of documents in Middleberg's possession, but not produced due to privileges claimed by Lighthouse.

The Harmons' Motion to Compel objected to Lighthouse's ability to assert privileges for the documents listed in the privilege log due to waiver.  The Harmons' waiver theory focused on the fact that the privilege log listed numerous, previously undisclosed email communications between a Lighthouse employee and a Middleberg attorney.  According to the Harmons, these email communications should have not only been in Middleberg's possession but, since they involved a Lighthouse employee, in Lighthouse's possession as well.  As discussed above, Lighthouse did not submit a privilege log along with its initial document production (in response to the Harmons' July 19, 2010 subpoena).  It is fundamental that Lighthouse had a duty to produce a privilege log listing withheld documents, even without request from the Harmons. *See* Fed. R. Civ. P. 26(b)(5); Fed. R. Bankr. P. 7026.  The Harmons pointed to Lighthouse's failure

to, at the outset, either produce the emails in question or submit a privilege log[9] as grounds for a finding that Lighthouse had waived its right to claim privileges.

The Harmons' Motion to Compel is significant not only because of the waiver issue it raised, but also because it illuminated what appeared to be an additional discovery failure on Lighthouse's part. The Motion to Compel reasonably assumed that email communications between Lighthouse and Middleberg should have remained in the possession of both entities. It therefore raised an additional, important question regarding the adequacy of Lighthouse's document production: whether Lighthouse failed to produce relevant e-mail communications.

The Motion to Compel also demonstrated that Lighthouse's counsel was incorrect when he represented to the Court, during the August 10, 2010 trial, his belief that Middleberg had complied with the subpoena and did not retain any additional, undisclosed documents. Trial Tr. vol. 1, 63:13-19. Middleberg produced hundreds of additional documents less than two weeks after the inaccurate belief was expressed to the Court. The Court does not find that Lighthouse's counsel intentionally expressed an incorrect belief or purposefully intended to mislead the Court. Instead, the Court finds that the representation is illustrative of a common theme of conjecture that has pervaded Lighthouse's handling of the discovery process.

The late production of hundreds of documents indicates that if Lighthouse made any inquiry of Middleberg, it was, at best, minimal. It is likely that the late production was due to Lighthouse's inaction, discussed above, upon receiving the July 19, 2010 subpoena. The late production also makes clear that Lighthouse's counsel's belief that Middleberg had fully complied with the subpoena was baseless conjecture. Lighthouse's counsel may have wanted to

---

[9] The Motion to Compel also points out that the July 19, 2010 subpoena contained the following language: "Please identify in a written response by date, author and recipient any document being withheld on the basis of any privilege, and state the privilege being alleged." Mot. to Compel 4, ECF No. 34.

have believed that Lighthouse produced all documents in Middleberg's possession.  The facts demonstrate that any such belief was not based on inquiry into the truth.

### b.   August 27, 2010 Hearing on the Harmons' Motion to Compel

Lighthouse responded to the Motion to Compel (ECF No. 38) on August 26, 2010 and the Court held a hearing on the Motion to Compel the following day.  During the hearing, the Court focused primarily on the question of whether the emails listed on the privilege log were in Lighthouse's possession when the July 19, 2010 subpoena was issued.  The Court noted that "well over 80% of [the] items in [the privilege log] are email communications" between Lighthouse and Middleberg.  Mot. to Compel Hr'g, 10:17, Aug. 27, 2010.  The Court expressed its concern that Lighthouse likely kept its own, internal records of its email communications.  If Lighthouse in fact maintained such records, then the email communications listed in the privilege log should have been disclosed earlier, in Lighthouse's response to the July 19, 2010 subpoena.

Lighthouse was unable to confirm or deny whether it maintained records of its email communications.  In so responding, Lighthouse acknowledged its inaction with regard to inquiry of its own email records: Lighthouse's counsel admitted that "in this action, an independent analysis of the Lighthouse email archives has not taken place."  *Id.* at 10:13.  This admission reflects Lighthouse's disregard for the discovery process.  Not only did Lighthouse fail to adequately check Middleberg's records, but Lighthouse failed to make any effort to review its own emails.

At the conclusion of the hearing, the Court granted Lighthouse additional time to review its email archives to determine whether they contained the emails listed in the privilege log.  The Court continued the hearing on the Motion to Compel to September 10, 2010.  The Court also re-scheduled the September 2, 2010 trial date for September 10, 2010.

### c.   September 10, 2010 Hearing on the Harmons' Motion to Compel

The Court resumed the hearing on the Harmons' Motion to Compel on September 10, 2010.  At the hearing, Lighthouse's counsel requested additional time for review of Lighthouse's email files.  The Court granted Lighthouse's request and ordered that Lighthouse complete its review (and any necessary production) by September 24, 2010.

The Court scheduled a trial on the privilege-waiver question for October 12, 2010.  The Court once again continued the trial that began on August 10, 2010 to a later, undetermined date.

### d.   Lighthouse's Supplemental Response to Motion to Compel

On September 24, 2010, Lighthouse filed Defendant's First Supplement in Response to Plaintiff's Emergency Motion to Compel Production of Allegedly Privileged Documents (ECF No. 43) ("Supplemental Response").  The Supplemental Response provided, in relevant part:

> Pursuant to the Court's direction, counsel for Lighthouse conducted a thorough review of the business records of [Lighthouse], including electronic records to determine whether and to what extent there may be additional documents responsive to the subpoena served on [Lighthouse] in this case by Defendants. Following this review, [Lighthouse] has made a supplemental production of non-privileged documents in response to the subpoena which is the subject of the Motion.  In addition, [Lighthouse] has produced a supplemental privilege log which identifies documents which may be responsive to the subpoena but which are also subject to claim of privilege on the part of [Lighthouse] and are being withheld at this time subject to a ruling by the Court with respect to the Motion [to Compel].

Def.'s Supplemental Resp. to Pl.'s Mot. to Compel 2, ECF No. 43.

The Supplemental Response confirmed that Lighthouse maintained internal email records.  It thus confirmed that Lighthouse possessed documents that should have been produced before the expiration of the August 2, 2010 discovery deadline.  Instead, the documents were not produced until late September.  Moreover, as will be discussed below, this late production did

not contain the Escrow Account bank statements that the Court ordered Lighthouse to produce on August 10, 2010.

### e.   October 12, 2010 Hearing on the Harmons' Motion to Compel

On October 12, 2010, the Court resumed the hearing (that was previously continued on September 10, 2010) on the Harmons' Motion to Compel.  During the hearing, the Court considered whether Lighthouse waived its right to assert privileges when it initially produced documents without submitting a privilege log or claiming any privileges.  The Court was especially troubled by the recent revelation that Lighthouse never searched its own email records during discovery.  The Court and Lighthouse's counsel engaged in the following discussion, in which Lighthouse's counsel attempted to rationalize Lighthouse's conduct:

**The Court:**

> I recall what I said is, I understand more why, in this situation, one wouldn't think to go review one's lawyers' files, than I would why you wouldn't review your own files, which would have shown communications with your lawyers, and I still don't understand that.

**Lighthouse's Counsel (Mr. Akerly):**

> It is what it is -- so, so, when we got to that hearing --

**The Court:**

> You say "it is what it is" but why is it that Lighthouse didn't review its own files and produce its own files with respect to its communications with counsel.  That's different than looking through its lawyers' files.  It's looking through your own files.

**Lighthouse's Counsel (Mr. Akerly):**

> Okay.  They did.  As Mr. Leshgold said, in the state court proceeding they'd received a similar request and actually produced 1 through 490 or 491.  But what they didn't do in the state court proceeding was that they had pulled out the privileged documents and produced the non-privileged documents. Okay.  Now when he

> got the request in this Court, he just reproduced the same documents. What we didn't do, is actually then create a log. What we didn't do is then create a privilege log based on the withholding.

**The Court:**

> I may be remembering his testimony wrong and I'll obviously go back and re-read it, or you can show it to me now, but I didn't think he ever went through emails at all, to determine what to produce.

**Lighthouse's Counsel (Mr. Akerly):**

> He had, yea, he had staff, and people under him --

**The Court:**

> Is that in his testimony?

**Lighthouse's Counsel (Mr. Akerly):**

> I think so, I'll have to go back, I don't have that in front of me either, but um --

**The Court:**

> Well let's look at that.

Mot. to Compel Hr'g 2:29-2:32, Oct. 12, 2010.

The Court and the parties then reviewed the relevant testimony given by Mr. Leshgold during the August 10, 2010 trial. They looked for statements made by Mr. Leshgold to support Mr. Akerly's representation of Mr. Leshgold's testimony—namely, that Lighthouse reviewed its communications with counsel during the state court proceeding but withheld those privileged documents in this case. The relevant testimony of Mr. Leshgold is provided in full above in Section 3(b) and (c).

Suffice it to say, there is nothing to support counsel's representation that Mr. Leshgold testified (during trial on August 10, 2010) that Lighthouse withheld privileged documents either

in the state court proceeding or in this case. The testimony is also devoid of Mr. Leshgold testifying about staff or people under him reviewing documents and then removing those documents that were subject to a claim of privilege. In fact, on three different occasions, Mr. Leshgold explicitly testified that Lighthouse had already produced (in state court and in this case) *all of the documents related to the Harmons' loan*:

> We had already produced *everything* prior.
>
> . . .
>
> We had given *everything* on this case in a prior discovery. I don't know when it was done. I'd given *everything* to Mr. Dyer and to our counsel at Robertson Anschutz.
>
> . . .
>
> We had produced *everything* that we had in relation to the Harmon case. There was *nothing else* that we had that was related to the case.

Trial Tr. vol. 1, 11:10-12:5, Aug. 10, 2010 (emphasis added).

Similarly, Mr. Leshgold also explicitly stated that he was unaware of Lighthouse retaining any documents in this case on the basis of attorney client privilege. The Harmons' counsel asked Mr. Leshgold whether there were "any other documents that [were] being retained by Lighthouse that would constitute attorney/client privilege documents?" *Id.* at 14:19-21. Mr. Leshgold responded: "Not that I'm aware of." *Id.* at 14:22.

Thus, Mr. Leshgold's testimony leads to the conclusion that counsel's representations were wholly inconsistent with the trial transcript. In all likelihood, counsel made the representations with the speculative hope that they would be substantiated by the transcript. Nevertheless, the transcript makes clear that his representations were unreasonable.

Then, after reviewing the transcript of Mr. Leshgold's testimony, Lighthouse's counsel and the Court continued their discussion.   Despite the damaging transcript evidence, Lighthouse's counsel again attempted to rationalize Lighthouse's conduct:

**Lighthouse's Counsel (Mr. Akerly):**

> Now, when we came back on the 27th of August, the discussion turned, now the Court sua sponte said, look, I'm looking at this privilege log from [Middleberg], why aren't, it looks like there's some communications from Lighthouse, how come those aren't produced?  Well, they weren't produced because their privileged, okay, you don't know anything more than that because (a) there's not a privilege log, and (b) there wasn't an objection.

**The Court:**

> Does [Mr. Leshgold] say that he only produced non-privileged documents?

**Lighthouse's Counsel (Mr. Akerly):**

> No, no, he says all, I think, I don't want to mischaracterize or misstate, but I think what he's saying is we had . . . given everything in the prior case.

**The Court:**

> Yea he's not saying he gave non-privileged things, he's saying he gave everything.    And everything didn't include any communications with his lawyers.

**Lighthouse's Counsel (Mr. Akerly):**

> No, no I think the fair, the fair indication from that, given everything in response, clearly, clearly there was some voluntary production of documents, obviously in the state court proceeding, which we reproduced here.   *But I think he's saying, given everything in response to the request, he's not saying we gave everything in our files.*   Now, on the 27th you instructed me . . . what ended up is I went back to Lighthouse Capital's files and went through them meticulously . . . and what resulted from that was a production which ended up being, I believe, 9[94] through 2[33]8.    There were addition documents, non-privileged documents to produce, and a privilege log.

> . . .
>
> So, the totality of documents produced in the case by Lighthouse is
> up to 2,338 pages, and I produced a privilege log.
>
> . . .
>
> So what you have then is, you have now a complete picture, *a*
> *complete production, and you have privilege logs*.

Mot. to Compel Hr'g 2:34-2:38, Oct. 12, 2010 (emphasis added).

The above discussion is significant for three reasons: (1) the modified, yet persistent, excuses argued by Lighthouse, (2) the size of Lighthouse's late document production, and (3) Lighthouse's representation, after an allegedly full and diligent inquiry by counsel, that there has now been a "complete production" in this case.

After the Court noted that Mr. Leshgold had testified to giving "everything" in the prior case, Lighthouse claimed that what Mr. Leshgold meant was that Lighthouse had "given everything in response to the request, he's not saying we gave everything in our files." *See id.* The Court finds that, given the indisputable transcript evidence, the response was evasive and unreasonable.

On three occasions, Mr. Leshgold testified that Lighthouse "produced *everything*" in the prior proceeding. Trial Tr. vol. 1, 11:10-12:5, Aug. 10, 2010 (emphasis added). Mr. Leshgold also stated that there was "*nothing else* that [Lighthouse] had related to the case." *Id.* (emphasis added). Mr. Leshgold's statements thus unambiguously communicated Mr. Leshgold's understanding that Lighthouse had not withheld any documents from the Harmons. Yet, even

after reviewing Mr. Leshgold's unambiguous testimony, Lighthouse nevertheless attempted to "spin" that testimony into less damaging facts.[10]

The Court was also surprised by the quantity of new documents produced by Lighthouse in September 2010. Lighthouse's supplemental document production included a privilege log and an additional *1,344 pages of internal documents*. The sheer volume of documents produced after the August 2, 2010 discovery deadline (compared to the fact that Lighthouse produced fewer than 500 documents within the discovery deadline) is once again evidence of Lighthouse's initial disregard for the discovery process. The late production of over one thousand documents reflects that it was only after the Court began to closely scrutinize Lighthouse's conduct that Lighthouse started taking the discovery process seriously.

Finally, the discussion is noteworthy because Lighthouse informed the Court: "you have now a complete picture, a complete production, and you have privilege logs." Mot. to Compel Hr'g 2:38, Oct. 12, 2010. At the very least, the statement implies that—as of the October 12, 2010 hearing and over two months after the expiration of August 2, 2010 discovery deadline— Lighthouse had completely performed its discovery obligations. The statement implies that all relevant documents had either been produced or listed in the privilege log. However, as is discussed in detail below in Section 5, the Court was eventually apprised that additional, material documents relating to the Escrow Account had not yet been produced.

---

[10] The Court understands an attorney's duty of zealous advocacy. However, the duty of zealous advocacy is not without boundaries. The Court expects attorneys to remain honest and forthright when confronted with damaging facts. *See Hanner v. O'Farrell*, 142 F.3d 434 (6th Cir. 1998) ("If a lawyer's view of zealous advocacy compels him to adopt tactics that he must know tread dangerously close to overstepping a boundary, he may ask for clarification."). An attorney treads close to exceeding those boundaries of zealous advocacy when he offers baseless (i.e. the claim that Mr. Leshgold testified to withholding privileged documents) and far-fetched (i.e. the unreasonably narrow interpretation of Mr. Leshgold's usage of the terms "everything" and "nothing else") theories in seeking to somehow rationalize a client's improper behavior.

At the conclusion of the October 12, 2010 hearing, the Court did not render a decision but instead requested additional briefing from the parties.

### f.   Conclusions Concerning the Harmons' Motion to Compel

On October 26, 2010, the Harmons filed Plaintiffs' Expedited Motion (1) to Approve Waiver of Production of Privileged Documents, (2) to Set Matter for Final Trial, and (3) for Expedited Pretrial Conference (ECF No. 54).   In the motion, the Harmons "reluctantly announce[d] their intention to waive the production of privileged documents [issue] . . . and . . . request[ed] that the Court proceed to trial after providing [the Harmons] a brief period to conduct . . . depositions . . . ."[11]  Pl.'s Mot. to Approve Waiver 3, ECF No. 54, Oct. 26, 2010.  The Court granted the Harmons' motion and scheduled a November 19, 2010[12] trial date.

Although the Court did not rule on the merits of the Motion to Compel, the filings and hearings concerning the Motion to Compel are nevertheless highly significant for two reasons. First, they demonstrated Lighthouse's failure to conduct any meaningful discovery before the August 2, 2010 discovery deadline.  Second, they illustrated Lighthouse's willingness to distort facts in order to rationalize Lighthouse's inaction.

### 5.  Lighthouse's Repeated Failure to Produce Escrow Account Bank Statements

The most egregious form of discovery abuse in this case involves Lighthouse's failure to produce Escrow Account bank statements.  The bank statements were requested by the Harmons in the July 19, 2010 subpoena.  The bank statements should have been produced by the August 2, 2010 discovery deadline.   The Court ordered Lighthouse to produce the Escrow Account

---

[11] The Court had advised the parties that if the Harmons prevailed on the privilege issue, the Court would stay its order to give Lighthouse a reasonable opportunity to prosecute an interlocutory appeal before allowing the Harmons to review the privileged documents.  The Harmons noted that they did not "have the luxury of waiting nine to twelve months for the appellate courts to rule on the privilege issue before going to trial . . . [and that the Harmons] simply [could not] afford to delay the resolution of this matter any longer."  Pl.'s Mot. to Approve Waiver 3, ECF No. 54.

[12] The Court planned to resume the August 10, 2010 trial at this time.

statements at the August 10, 2010 trial and Lighthouse's counsel stated that they would "endeavor" to do so.

Nevertheless, despite the Court's order and numerous opportunities (after the August 10, 2010 trial) to produce the Escrow Account statements, Lighthouse failed to produce the statements until November 11, 2010.  In the meantime, on August 18, 2010, Lighthouse did produce other bank statements, which were related to the Harmons' loan.  Lighthouse inaccurately purported that those bank statements were the bank statements on the Escrow Account.  This only distorted the facts of the case and wasted the Court's and the Harmons' time and resources.  Then, after finally producing the true Escrow Account statements on November 11, 2010, Lighthouse offered an incredible story in order to rationalize Lighthouse's conduct.

### a.   The Harmons' September 8, 2010 Motion for Leave to File Trial Amendment

On September 8, 2010, the Harmons filed Plaintiffs' Motion for Leave to File Trial Amendment (ECF No. 41) ("Motion for Leave").  The Motion for Leave provided that Lighthouse produced the missing Escrow Account statements on August 18, 2010.  The Motion for Leave contended that, upon review of the Escrow Account statements, it became evident that Lighthouse failed to abide by the Escrow Account agreement, which required Lighthouse to maintain $177,715.83 of the funds Lighthouse loaned to the Harmons in an Escrow Account. *See Harmon*, 2010 WL 4273078, at *1.

Under the Escrow Account agreement, Lighthouse agreed to apply a portion of the $177,715.83 in escrowed funds each month towards the Harmons' monthly interest payment. *Id.* In the Motion for Leave, the Harmons "claim[ed] that instead of transferring the requisite interest payment on a monthly basis out of an escrow account, as required by the [Escrow Account] agreement, Lighthouse treated the $177,715.83 as a ***consolidated interest prepayment*** of all

interest due over the course of the twelve month loan." *Id.* (emphasis original).  The Harmons based this allegation on the fact that the Escrow Account bank statements produced by Lighthouse showed a balance well below the $177,715.83[13] that should have been in the Escrow Account under the Escrow Account agreement.

The Harmons' Motion for Leave requested the Court's permission to amend their complaint to include the following two claims:

> First, the Harmons allege[d] that Lighthouse's use of the $177,715.83 violated § 1639(g) of the Truth in Lending Act ("TILA").  Section 1639(g) provides that a "mortgage referred to in section 1602(aa) of this title may not include terms under which more than *2 periodic payments* required under the loan are *consolidated* and *paid in advance* from the loan proceeds provided to the consumer." 15 U.S.C. § 1639(g) (emphasis added).  Second, the Harmons contend[ed] that Lighthouse, as the Harmon's escrow agent, breached its fiduciary duty to the Harmons by failing to properly maintain the $177,715.83 in an escrow account.

*Id.* at *2.  The Harmons argued that leave to amend was appropriate because "they were neither aware nor capable of becoming aware of the existence of such claims *until Lighthouse produced the bank statements on August 1[8], 2010.*" *Id.* (emphasis added).

For the purposes of this opinion, the significance of the Motion for Leave does not lie in the additional causes of action the Harmons sought to plead against Lighthouse.  Instead, the Motion for Leave is noteworthy because the foundation for the two additional causes of action—the bank statements produced by Lighthouse on August 18, 2010—is of critical importance in understanding why the Court sanctioned Lighthouse.  As will be discussed in detail below, the account represented by the bank statements—also known as Account #2462—was related to the

---

[13] For the sake of simplicity, the Court refers to $177,715.83 as the requisite account balance.  In reality, under the Escrow Account agreement, the $177,715.83 initially held in the Escrow Account was expected to decrease each month to account for monthly interest payments.  However, except for approximately one day immediately after the loan closed, the purported Escrow Account bank statements produced by Lighthouse never maintained any amount of cash even remotely close to $177,715.83.

Harmons' loan;[14] however, the account was not the actual Escrow Account used by Lighthouse to maintain the $177,715.83. Thus, although the Harmons and the Court reasonably believed the Escrow Account statements were produced on August 18, 2010, they would later discover that Lighthouse had not yet produced the actual Escrow Account statements.[15]

### b.  Lighthouse's September 24, 2010 Response to the Motion for Leave

On September 24, 2010, Lighthouse filed Defendant's Response to Motion for Leave to File Trial Amendment (ECF No. 44) ("Response to Motion for Leave"). The Response to Motion for Leave is of considerable import not only because of the statements it contains but also due to its omissions.

Lighthouse's opening statement is especially telling. It provided: "Plaintiff's *entire Motion* [for Leave] seeking to add 2 new causes of action is *predicated* upon Plaintiff's claim that the $177,715.83 was not deposited by Lighthouse and *applied pursuant to the terms of the Escrow Arrangement and Agreement*." Def.'s Resp. to Mot. for Leave 1, ECF No. 44 (emphasis added). This statement is in complete accord with the Court's observation directly above that the bank statements (produced by Lighthouse on August 18, 2010) provided the foundation for the Harmons' Motion for Leave. For, without those bank statements, the Harmons would have had no reason to believe that Lighthouse breached the Escrow Account agreement and, therefore, no reason to file the Motion for Leave in the first place. The Response to Motion for Leave's

---

[14] A total of $230,000.00, including $177,715.83 in Escrow Account funds, was transferred out of this account shortly after the Harmons' loan closed. Lighthouse did not produce the account which received the $230,000.00 transfer, the actual Escrow Account, until November 11, 2010.

[15] For the sake of clarity, it is useful to review the issues surrounding the Escrow Account bank statements as of the filing of the Motion for Leave on September 8, 2010. The Escrow Account bank statements should have been produced by the August 2, 2010 discovery deadline pursuant to a July 19, 2010 subpoena requesting all documents related to the Harmons' loan. Lighthouse failed to produce any Escrow Account bank statements before the August 10, 2010 trial. After the August 10, 2010 trial, Lighthouse agreed to produce the Escrow Account bank statements. Lighthouse then produced certain bank statements on August 18, 2010. These bank statements were related to the Harmons' loan but the Harmons and the Court would later learn, as discussed below, that they were not the bank statements of the actual Escrow Account. Thus, Lighthouse had once again failed to produce the Escrow Account bank statements.

opening statement is highly significant because it is, in effect, Lighthouse's acknowledgement of the Harmons' reliance upon the bank statements that Lighthouse produced on August 18, 2010.

Even more telling, however, is the fact that Lighthouse completely failed to mention that the Harmons' Motion for Leave was *predicated on the wrong bank statements*. The Motion for Leave undoubtedly put Lighthouse "on notice" that the Harmons were relying on the bank statements that were purported by Lighthouse to be the Escrow Account bank statements. At this time, Lighthouse should have recognized its failure to produce the actual Escrow Account bank statements and brought this failure to the attention of the Harmons and the Court. The Court concludes that it would not have been possible for Lighthouse to have reviewed the Motion for Leave without recognizing that it was premised on the wrong bank statements. Nevertheless, Lighthouse did not correct its error.

Instead, Lighthouse proceeded to object to the Motion for Leave on its merits, which dragged the Harmons and the Court down a rabbit trail involving a dispute premised entirely upon an inaccurate set of facts.[16] This rabbit trail included a hearing on the Motion for Leave, an order requiring the Harmons to brief certain disputed legal issues, and the issuance of a Memorandum Opinion[17] resolving the Motion for Leave. As will be made clear below, these pointless exercises could easily have been avoided if Lighthouse had informed the Court that Lighthouse had not yet produced the actual Escrow Account bank statements.

---

[16] Ironically, Lighthouse's Response to Motion for Leave included a sentence claiming the Harmons "have once again embarked upon a course of blaming others for allegedly not knowing or understanding the facts." Def.'s Resp. to Mot. for Leave 1, ECF No. 44. In reality, Lighthouse was the only entity capable of knowing the facts at that time. Lighthouse's Response to Motion for Leave only exacerbated Lighthouse's initial distortion (through its incomplete document production) of the facts.

[17] In the Court's October 22, 2010 Memorandum Opinion resolving the Harmons' Motion for Leave, the Court made the finding that "Lighthouse had caused . . . delay by failing to produce the [Escrow Account] bank statements when they were originally requested by the Harmons [on July 19, 2010]." *Harmon*, 2010 WL 4273078, at *3. At the time the Court made that finding, the Court was under the false impression that Lighthouse had produced the Escrow Account statements on August 18, 2010.

### c. The October 12, 2010 Hearing on the Harmons' Motion to Compel

The Court finds it instructive to reiterate the point made above in Section 4(e) of this Memorandum Opinion that at the October 12, 2010 hearing on the Harmons' Motion to Compel, Lighthouse's counsel made the following statement: "you have now a complete picture, a complete production, and you have privilege logs."  Mot. to Compel H'rg 2:38, October 12, 2010.  At the very least, the statement implied that all relevant documents had either been produced or disclosed in the privilege log.[18]   However, at the time the statement was made, Lighthouse had still not yet produced the actual Escrow Account bank statements.

### d. The Harmons' November 11, 2010 Emergency Motion for Sanctions

On November 11, 2010, the Harmons filed Plaintiffs' Supplement to First Amended Complaint (ECF No. 63).[19]   In the Supplement, the Harmons restated allegations first made in their Motion for Leave:

> It is now clear that the prepaid interest of $177,715.83 was never maintained in any escrow account because the account balance in the so-called escrow account was far less than $177,715.83 on April 30, 2010 . . . .   In fact there never was a balance in the alleged escrow account at the end of any month from April 2008, forward, high enough to represent anywhere near what the balance of the Harmon escrowed funds should have been.
> . . .
>
> It thus appears clear to Plaintiffs that the $177,715.83 was initially advanced into the so-called escrow account, but on the same date it was transferred out to some unnamed account.  Thus, from a physical point of view, this was not an interest escrow out of which monthly payments would be made; in reality, this was an interest prepayment for all interest due during the twelve months of the loan.

---

[18] This conclusion is further supported by the fact that the Court ordered Lighthouse to complete its production of additional documents by September 24, 2010.  *See* Section 4(c) above.

[19] On October 22, 2010, the Court issued an order granting, in part, the Harmons' Motion for Leave to amend their complaint (ECF No. 51).  *See also Harmon*, 2010 WL 4273078, at *1.

Pls.' Supplement to First Am. Compl. 2-3, ECF. No. 63, Nov. 11, 2010.  Thus, at the time the

Harmons filed the Supplement, they were still under the false impression that the bank

statements produced by Lighthouse on August 18, 2010 were the Escrow Account statements.

However, late in the day on November 11, 2010, the Harmons filed Plaintiffs'

Emergency Motion for Sanctions Against Lighthouse and its Attorneys (ECF No. 64) ("Motion

for Sanctions").  The Motion for Sanctions quoted an email[20] (the "Akerly Email") that the

Harmons' counsel received from Mr. Akerly on the evening of November 11th:

> Leonard,
>
> [Lighthouse] has heretofore produced bank account statements
> relating to and involving the prepaid interest escrow funds at issue
> in this action.  Attached are statements for the accounts involved
> which held and account for the funds at issue.  *I **believe** these have
> been previously produced by [Lighthouse] in whole or part.*
> However, I could not confirm this and, because Bruce Badger was
> not around today (Veteran's Day) I wanted to get these to you in
> plenty of time for your review prior to [Lighthouse's] deposition
> on Monday.  If you have any questions, please let me know.
>
> To the extent necessary, please consider this as a supplemental
> production to your previously served subpoena on Mr. Leshgold.
>
> Best regards.
>
> Bruce

Pls.' Emerg. Mot. for Sanctions 5, ECF No. 64, Nov. 11, 2010 (emphasis added).  Four zipped

files, each file containing bank statements from a different Lighthouse bank account, were

attached to the Akerly Email.  The Motion for Sanctions explained that, "[i]n essence, numerous

statements for four new Lighthouse bank accounts have been produced . . . seven days before

trial."  *Id.*  The Motion for Sanctions then requested the following relief:

---

[20] The Akerly Email was admitted into evidence at the November 19, 2010 hearing on the Motion for Sanctions, which is discussed below.

This Court must now exercise its power to sanction Lighthouse and its attorneys for their conduct in this case. Plaintiffs assert that nothing less than striking the pleadings of the Defendant in this case, and granting judgment in favor of Plaintiffs will correct the actions and conduct of Defendant and its counsel in this case due to the inability to insure the integrity of the process in this case. Plaintiffs would ask the Court to exercise all of its power to enter sanctions in this case, whether under its inherent authority, or under Rules 11 and 26(g)(3), or under 28 U.S.C. § 1927. This Court cannot permit this conduct to pass without a severe sanction; otherwise, the integrity of the system will suffer irreparably. There must be integrity and believability and trust in the discovery process; otherwise the system simply fails.

*Id.* at 6.

### e. Lighthouse's November 17, 2010 Response to the Motion for Sanctions

On November 17, 2010, Lighthouse filed Defendant's Response to Plaintiff's Emergency Motion for Sanctions Against Lighthouse and its Attorneys (ECF No. 69) ("Response to Motion for Sanctions"). The Response to Motion for Sanctions first explained the role of the account ("Account #2462")[21] for which bank statements were produced on August 18, 2010. "[F]unds were placed by [Lighthouse into Account #2462] and transferred out to Fidelity Title Company to facilitate the consummation of the Harmon loan." Def.'s Resp. to Mot. for Sanctions 2, ECF No. 69, Nov. 17, 2010. Additional funds within Account #2462 were then transferred by Lighthouse to another bank account—Account #3398. *Id.* The funds transferred from Account #2462 into Account #3398 became the Escrow Account funds and, therefore, Account #3398 was the actual Escrow Account.[22] *Id.*

---

[21] Each of the five bank accounts—Account Nos. 2462, 3398, 5571, 5308, and 3778—that the Court references below have seven-digit account numbers. However, the Court refers to each account by its last four digits.

[22] Prior to November 11, 2010, the Court and the Harmons were under the false impression that Account #2462 was the Escrow Account. However, Account #2462 contained the Escrow Account funds for only a very short time period.

The Response to Motion for Sanctions also explained the nature of the four accounts

Lighthouse produced via the Akerly Email on the evening of November 11, 2010:

> While it is true that the bank statements for [Account ## 3398,
> 5571, 5308, and 3778] were in the possession of counsel for
> [Lighthouse] as early as September 9, 2010, but were not provided
> to counsel for Plaintiffs until November 11, 2010, it is equally true,
> as reflected by Ms. Dennis' deposition testimony on November 15,
> 2010, that (a) the bank statements relating to [Account ## 5308 and
> 3778] have[sic] nothing to do with the Plaintiffs or the Harmon
> Loan and were *inadvertently produced* and (b) the bank statements
> relating to [Account #5571], while technically relating to the
> Harmon Loan, only held the initial $5,000 deposit put up by the
> Harmons at the beginning of the lending relationship.[23]  *None of
> these 3 accounts has anything to do with the Escrow [Account].*  In
> summary, there are statements relating to the Escrow Funds are the
> statements relating to [Account # 2462] (which relating to the
> initial funding of the Harmon Loan and were produced on August
> 18, 2010) and [Account # 3398] (which were produced on
> November 11, 2010 . . . and which account held the actual Escrow
> Funds that were paid out on a monthly basis as interest became due
> and payable to LCF under the Note).

*Id.* at 2-3 (emphasis added).  Thus, Lighthouse admitted that two of the four sets of bank

statements produced in the Akerly Email were "inadvertently produced" and were unrelated to

the Harmon loan.  A third set of bank statements, from Account #5571, were only tangentially

related to the Harmons' loan and were unrelated to the Escrow Account.  *Id.*  The fourth set of

bank statements produced, however, were the bank statements for Account #3398, the actual

Escrow Account.

In a footnote, Mr. Akerly rationalized the late production of the Escrow Account bank

statements:

> The reason for the late production is that counsel for [Lighthouse]
> believed that they had already been produced as part of the
> supplemental production of documents that followed his trip to
> [Lighthouse's] offices in California.   When   counsel   for

---

[23] The $5,000.00 deposit is unrelated to the Escrow Account and represents funds deposited by the Harmons with
Lighthouse at the time Lighthouse was considering lending to the Harmons.

> [Lighthouse] reviewed Plaintiffs' *Notice of Depositions* (filed November 7, 2010; Adv. Dkt. No. 57) he realized that the only bank statements attached were those involving [Account #2462] and not the others.  That is why the additional statements were tendered to counsel for Plaintiffs.   Truly an oversight and excusable as such.

*Id.* at 3, n.2 (emphasis original).

Lighthouse's Response to Motion for Sanctions then proceeded to marginalize the importance of the Escrow Account bank statements in this litigation, in an effort to excuse their late production:

> Notwithstanding [the Harmons' counsel's] hyperbole and smoke-screen, there is absolutely no evidence that the failure to produce the statements for Account #3398 (the only account other than Account #2462 which applies to the Escrow Fund) was intentionally withheld.  If anything, as noted herein, the evidence indicates the failure to produce was the result of *harmless error and inadvertence* on the part of LCF's counsel.

> Also, there is *no evidence of any harm or prejudice* to Plaintiffs by the failure to produce the statements for Account #3398 . . . .[I]t is highly doubtful and certainly skeptical that Plaintiffs' spent "nearly three months…prepar[ing] their case around eighteen pages of bank statements for the so-called escrow account…." (Motion at 4).  There is no mention of a specific issue with respect to the Escrow Account or Escrow Funding in Plaintiffs' Amended Complaint, other than a strained reading between the lines.  Plaintiffs have never sought a direct deposition with respect to the bank statements relating to Account #2462.  In any event, Plaintiffs *Notice of Depositions* directed to [Lighthouse] resulted in Plaintiffs having a full and complete opportunity, well in advance of trial, to examine Ms. Dennis (who [Lighthouse] voluntarily produced) with respect to all of the accounts at issue and, as the transcript of that deposition will reveal, [Lighthouse] provided Plaintiffs with absolutely no grounds to object to the Escrow Account, the Escrow Funds, or the fact that the statements for Account # 3398 were not timely produced.

*Id.* at 5-6.

Additionally, in response to the Harmons' claim that they were essentially run down a rabbit trail by the late production of the Account # 3398's bank statements, Lighthouse's counsel rejoined:

> Arguably, if [the Harmons' counsel] has spent three months building his case on the basis of the statements for Account #2462 he should have realized from reviewing the statements that they reference $230,000 of the funds retained by [Lighthouse] at closing as being transferred into Account #3398, yet he never mentioned or questioned this fact.[24]

*Id.*

Lighthouse's Response to Motion for Sanctions shocked and disturbed the Court. In the response, Lighthouse essentially "doubled-down" on its evasion and conjecture, in order to rationalize its own failures.

First, Lighthouse's argument that there has not been any harm or prejudice due to its failure to produce the Escrow Account was unreasonable. Lighthouse's failure to produce the true Escrow Account statements until November 11, 2010 distorted the facts of this case, and wasted both the Harmons' and the Court's time and resources.

The Harmons' motion for leave to amend was granted, in part, by the Court based on the premise that the statements that Lighthouse had produced in discovery were the Escrow Account statements. Given the Court's substantial reliance on Lighthouse's production, it is unreasonable for Lighthouse to argue that the production of the actual statements was of little consequence; the original statements changed the course of the pleadings and the litigation.

Second, Lighthouse's claim that the production of three irrelevant bank accounts "was truly an oversight and excusable as such" was irresponsible. The Court explicitly made

---

[24] The Court finds this response was irresponsible. Lighthouse was required to produce the Escrow Account statements; it was not the Harmons' role to hypothesize the meaning of Account #3398 when the account had not yet been produced.

Lighthouse aware on August 10, 2010 that it should have already produced the Escrow Account bank statements.  It goes without question that Lighthouse should have been cognizant of the importance of quickly producing the statements.  Lighthouse completely failed to expeditiously produce the bank statements.  Then, when Lighthouse did finally produce the Escrow Account statements, the production also included completely irrelevant bank statements.   Given Lighthouse's conduct throughout the discovery process, the Court is extremely hesitant to conclude that such a late and irrelevant production was the result of an excusable oversight.

Third, Lighthouse's claim that "[t]here is no mention of a specific issue with respect to the Escrow Account or Escrow Funding in Plaintiffs' Amended Complaint" was inaccurate.  As discussed above, the Harmons' Motion for Leave and the Supplement to First Amended Complaint are fundamentally based upon Lighthouse's failure, given the statements Lighthouse produced on August 18, 2010, to maintain an Escrow Account.  Lighthouse explicitly recognized this fact in its Response to Motion for Leave: "Plaintiff's *entire Motion* [for Leave] seeking to add 2 new causes of action is *predicated* upon Plaintiff's claim that the $177,715.83 was not deposited by Lighthouse and *applied pursuant to the terms of the Escrow Arrangement and Agreement*."   Def.'s Resp. to Mot. for Leave, 1 (ECF No. 44) (emphasis added).  Thus, Lighthouse's rationalization of the immateriality of the Escrow Account is baseless.  The Escrow Account is material to this case and it should have been produced long before November 11, 2010.

### f.  November 19, 2010 Hearing on Motion for Sanctions

On November 19, 2010, the Court held a hearing on the Harmons' Motion for Sanctions.  At the conclusion of the hearing, the Court held that, for the purposes of this litigation, Lighthouse failed to establish an Escrow Account.

The most serious and troubling testimony elicited at the hearing concerned Lighthouse's evasive and questionable justifications for failing to timely produce the Escrow Account bank statements.

**Lighthouse's Counsel (Mr. Akerly):**

> Yeah, I produced to you documents relating to the escrow account, yes. And it does relate to the escrow account. But at that time, my understanding was that there were other accounts -- from my conversations with Ms. Meyer -- there were other accounts that were being located from Lighthouse which were in storage.

**Harmons' Counsel (Mr. Simon):**

> Let me just ask you. Why are you surprised that I would jump to the conclusion that the accounts that were produced on August 18 represented the so-called escrow account?
> . . .

**Lighthouse's Counsel (Mr. Badger):**

> Objection, your Honor. Relevance. What he's surprised about --

**Lighthouse's Counsel (Mr. Akerly):**

> I'd love to answer it.

**Lighthouse's Counsel (Mr. Badger):**

> -- as to Mr. Simon at this point is clearly --

**Harmons' Counsel (Mr. Simon):**

> It's cross examination, your Honor.

**The Court:**

> Overruled.

**Harmons' Counsel (Mr. Simon):**

> Why would that surprise you?

**Lighthouse's Counsel (Mr. Akerly):**

      It doesn't, knowing who you are and what you are; it doesn't surprise me.  Because you clearly didn't have all the facts and you're trying to make a case as a plaintiff's lawyer.  I mean, this particular factual statement in this paragraph is essentially -- you know.  You know you don't have all the facts and you're twisting them to essentially say something that they're not.  You say, "It went into another account."  You say, "It's a general account."  It says right here. You say, "It's a general account."  And again, this is September 8th.

**Harmons' Counsel (Mr. Simon):**

      Am I not permitted --?

**Lighthouse's Counsel (Mr. Akerly):**

      Just a minute, sir.  This is September 8th.

**Harmons' Counsel (Mr. Simon):**

      As an attorney --

**Lighthouse's Counsel (Mr. Akerly):**

      Excuse me.  This is September 8th, okay?  We're still looking for the documents at Lighthouse's offices.  I had boxes and boxes delivered to my office at that time.  I hadn't even gone through -- I didn't even make my production to you until October -- I think I asked for several extra weeks until the end of September or early October, okay?  *I got the additional [bank account] records from Ms. Meyer around [September] 9th, okay?  I assumed those were going to be placed into the documents that were produced to you.*

**Harmons' Counsel (Mr. Simon):**

      But they weren't.

**Lighthouse's Counsel (Mr. Akerly):**

      I know.  When I got your notice of deposition, okay, your recent notices of deposition, you attached that account [#2462] and *it became clear to me that you don't have all the accounts.*

**Harmons' Counsel (Mr. Simon):**

Pass the witness, your Honor.

**Lighthouse's Counsel (Mr. Akerly):**

That's when I sent you the [Akerly E-mail].  And if you read Harmon Exhibit -- if you read Harmon Exhibit 3, [also known as, the Akerly Email,] it says, "Attached are statements for the accounts involved which held and account for the funds at issue.  *I **believe** these have been previously produced by [Lighthouse] in whole or in part.  However, I could not confirm this and because Mr. Badger was not around today --Veterans Day -- I wanted to get these to you in plenty of time for your review prior to LCF's deposition on Monday*."  Which you took and which you fully had the opportunity to examine [Lighthouse].

**Harmons' Counsel (Mr. Simon):**

Let me just ask you as question.

**Lighthouse's Counsel (Mr. Akerly):**

Thank you.

**Harmons' Counsel (Mr. Simon):**

*How is it that you could not confirm it, Mr. Akerly, when you were the one who assembled the documents and produced them out of Lighthouse's files in early October 2010?  All you had to do was go back to that production and then go back to your e-mail --*

**Lighthouse's Counsel (Mr. Akerly):**

And I did.

**Harmons' Counsel (Mr. Simon):**

-- production on August 18th.

**Lighthouse's Counsel (Mr. Akerly):**

And I did.

**Harmons' Counsel (Mr. Simon):**

And you could have determined that they weren't produced.

**Lighthouse's Counsel (Mr. Akerly):**

No, it didn't appear to me that it was an issue that you were finally taking discovery on, okay? You were finally noticing a deposition to take discovery on the escrow issue. You attached the statement. *And I said, "Wait a minute. If he's going to examine Lighthouse's witness on the escrow account, he needs to have the accounts*." I went back. I looked. *"Oh, my gosh."* The ones that Charlotte gave me -- Ms. Meyer gave me -- *they didn't get into the production.*

**Harmons' Counsel (Mr. Simon):**

How did you determine --?

**Lighthouse's Counsel (Mr. Akerly):**

Now I'm producing them to you a week before the deposition, plenty of time for you to examine –

**Harmons' Counsel (Mr. Simon):**

When did you determine that?

**Lighthouse's Counsel (Mr. Akerly):**

Plenty of time for you to examine.

**Harmons' Counsel (Mr. Simon):**

When did you make that determination?

**Lighthouse's Counsel (Mr. Akerly):**

When I got your [November 7, 2010] notice.

**Harmons' Counsel (Mr. Simon):**

You made that determination when you got my notice? My notice preceded your [Akerly] [E]-mail of [November] 11th; did it not?

**Lighthouse's Counsel (Mr. Akerly):**

> That's right. That's right.

**Harmons' Counsel (Mr. Simon):**

> You received my notice of deposition on the 7th of November; did you not?

**Lighthouse's Counsel (Mr. Akerly):**

> Yes, because now you're finally doing discovery on the escrow account. And I'm thinking --

**Harmons' Counsel (Mr. Simon):**

> And that's when you say you determined that, "Oh, my God, he doesn't have the accounts." And you determined that I didn't have the accounts.

**Lighthouse's Counsel (Mr. Akerly):**

> Yeah, because based upon your earlier pleadings and other things, it was clear that you made mistakes constantly. You were listing -- you were constantly in error on many other things throughout this case and so I said, "Look. He's only got the [2]462 account" -- or whatever the number is.

**Harmons' Counsel (Mr. Simon):**

> *So, then, why are you saying here on the 11th, four days later, why are you saying that you think that these accounts may have been previously produced when you say on the 7th of November when you received my notice, you determined that, in fact, you hadn't produced them*?

**Lighthouse's Counsel (Mr. Akerly):**

> Because I had to go back through the records. I, too, have a lot of things going on in my calendar and I went back and I finally went back through the record and when I realized the problem, I produced them to you.

**Harmons' Counsel (Mr. Simon):**

> When did you go back to your record?

**Lighthouse's Counsel (Mr. Akerly):**

>After I got your notice.

**Harmons' Counsel (Mr. Simon):**

>But before you sent the [Akerly E]-mail?

**Lighthouse's Counsel (Mr. Akerly):**

>What?

**Harmons' Counsel (Mr. Simon):**

>You went back to the record after you got my notice on the 7th, but before you sent the e-mail on the 11th of November.

**Lighthouse's Counsel (Mr. Akerly):**

>Is there a question?

**Harmons' Counsel (Mr. Simon):**

>Isn't that correct?

**Lighthouse's Counsel (Mr. Akerly):**

>Yeah.

**Harmons' Counsel (Mr. Simon):**

>*Well, then, why are you telling me in your [Akerly E]-mail on the 11th that you thought that these were previously produced*?

**Lighthouse's Counsel (Mr. Akerly):**

>Because I had.  I thought they had -- are you not getting it?

**Harmons' Counsel (Mr. Simon):**

>Pass the witness.

**Lighthouse's Counsel (Mr. Akerly):**

>Are you not getting it?

**Harmons' Counsel (Mr. Simon):**

>    No.  I'm getting it.  Pass the witness.

Mot. for Sanctions Hr'g Tr. 71:14-76:15, Nov. 19, 2010 (emphasis added).

Before fully evaluating Mr. Akerly's testimony, it is helpful to briefly review the significant dates involving the Escrow Account bank statements.  The Escrow Account statements were requested by the Harmons on July 19, 2010 and should have been produced by the August 2, 2010 discovery deadline.  Lighthouse failed to sufficiently respond to the Harmons' production requests and no Escrow Account bank statements were produced before the August 10, 2010 trial.

At trial, in a discussion quoted above in Section 3(a), Lighthouse was unable to adequately explain why Lighthouse failed to produce the Escrow Account statements.  The Court admonished Lighthouse for its conduct and Lighthouse's counsel agreed to produce the Escrow Account bank statements.  On August 18, 2010, Lighthouse produced certain bank statements that were purported to represent the Escrow Account.

On September 8, 2010, the Harmons filed the Motion for Leave based on the conclusion—upon review of the bank statements Lighthouse produced—that Lighthouse failed to maintain an Escrow Account.  By September 9, 2010, Mr. Akerly and other Lighthouse attorneys had possession of the Escrow Account bank statements.  Despite Lighthouse's counsel's possession of the Escrow Account bank statements, Lighthouse filed a response to the Motion for Leave on September 24, 2010, which failed to mention that the Motion for Leave was predicated upon the wrong bank statements.

In late September, Lighthouse produced an additional 1,344 pages of documents, but failed to produce the actual Escrow Account bank statements.  It was not until November 11,

2010, one week before trial, that Lighthouse produced the actual Escrow Account statements, along with three other irrelevant bank accounts. By that time, the Harmons had amended their pleadings based on Lighthouse's false representation that it had produced the Escrow Account bank statements.

With this background in mind, the Court evaluates Mr. Akerly's testimony.  It begins with Mr. Akerly's claim that, when he produced the first bank statements on August 18, 2010, "it was his understanding that there were other accounts . . . there were other accounts that were being located from Lighthouse which were in storage." *Id.* at 71:16-19.  There is no evidence that Mr. Akerly communicated this understanding to the Court or the Harmons before the November 19, 2010 hearing.  Lighthouse was ordered to produce the Escrow Account after the August 10, 2010 trial.  Both the Court and the Harmons were under the impression that this production occurred eight days later.  Lighthouse and its counsel never even mentioned their awareness of the existence of any additional accounts until the filing of the November 17, 2010 Response to Motion for Sanctions.  Mr. Akerly's evasive response on November 19, 2010 was baseless conjecture.

Next, Mr. Akerly attempted to explain that the late production of the actual Escrow Account bank statements was excused due to the significant amount of boxes that he had to review throughout September 2010:

> This is September 8th, okay?  We're still looking for the documents at Lighthouse's offices.  I had boxes and boxes delivered to my office at that time.  I hadn't even gone through -- I didn't even make my production to you until October -- I think I asked for several extra weeks until the end of September or early October, okay?  *I got the additional [bank account] records from*

> *Ms. Meyer around the 9th, okay?*  I *assumed*[25] those were going to
> be placed into the documents that were produced to you.

*Id.* at 72:21-73:4 (emphasis added).   This testimony is contradicted by an email from Mr. Leshgold to Ms. Meyer, Lighthouse's counsel, on September 9, 2010 that contained no other additional documents but the bank statements for the four accounts later produced in the Akerly Email.[26]   Ms. Meyer testified on November 19, 2010 that she "sent those [bank account] documents to Mr. Akerly and Mr. Badger."  *Id.* at 43:3.  And Mr. Akerly stated at the November 19th hearing that he received the accounts from Ms. Meyer around September 9th.  Thus, the accounts were not bogged down in "boxes and boxes" delivered to Mr. Akerly's office.  The accounts were segregated in an email delivered to Ms. Meyer and then to Mr. Akerly around September 9, 2010.  Mr. Akerly's insinuation that the bank account statements were intermingled with boxes and boxes of documents is mere hyperbole.

Furthermore, Lighthouse's counsel agreed to produce the Escrow Account bank statements at the August 10, 2010 trial.  They received the bank statements on or before September 9, 2010.  On September 10, 2010, Lighthouse's counsel was ordered at the hearing on the Motion to Compel to complete its internal document review and any necessary production by September 24, 2010.  The fact that the bank statements were not produced by September 24, 2010 is inexcusable.

Next, Mr. Akerly gave the most significant and also most damaging testimony from the hearing on the Motion for Sanctions.  In attempting to justify the statement in his e-mail to Mr. Simon that he believed that the statements had previously been produced, Mr. Akerly

---

[25] Mr. Akerly was the individual who produced the documents in September 2010.  Mr. Akerly never explained how he could have "assumed" other attorneys would produce the bank account statements when he was the attorney making the document productions.  Such an assumption, if he actually made it, was unreasonable.

[26] See Harmons' Exhibit 5, introduced at the November 19, 2010 hearing.

provided the following inconsistent statements.  First, he stated: "When I got your [November 7, 2010] notice of deposition, okay, your recent notices of deposition, you attached that account [#2462] and *it became clear to me that you don't have all the accounts*."  *Id.* at 73:6-8 (emphasis added).  In fact, Mr. Akerly claimed that it was on November 7, 2010 that he "realized"[27] the Harmons only had Account #2462.  *Id.* at 75:11-15.

However, on November 11, 2010, Mr. Akerly wrote the following e-mail communication to Mr. Simon, the Harmons' counsel: "Attached are statements for the accounts involved which held and account for the funds at issue.  *I **believe** these have been previously produced by [Lighthouse] in whole or in part.*  However, I could not confirm this . . . because Mr. Badger was not around today . . . ."  *Id.* at 73:13-17 (emphasis added).  Thus, on November 11, 2010, Mr. Akerly expressed his "belief"—in the present tense—to Mr. Simon that certain bank accounts were "previously produced."  *Id.*

The Akerly E-mail, which Mr. Akerly voluntarily read into the record while testifying, contains statements that cannot be reconciled with Mr. Akerly's testimony that he realized the failure to produce the bank statements on November 7, 2010.  It is simply impossible for Mr. Akerly to have (i) realized on November 7, 2010 that the Harmons did not have all the bank statements, and (ii) believed on November 11, 2010 that the bank statements contained in the Akerly Email were previously produced.

This impossibility is further supported by review of the end of the Harmons' counsel's examination of Mr. Akerly.  *See id* at 75:16-76-15.  The Harmons' counsel pressed Mr. Akerly to

---

[27] Mr. Akerly's testimony was that he "realized" on November 7, 2010 that the Harmons only had Account #2462. *Id.* at 73:6-8, 75:11-15.  The Court finds that, at the very latest, Mr. Akerly discovered the non-production of the Escrow Account statements on November 7, 2010.  Given the numerous instances (summarized at the beginning of this section and detailed throughout this Memorandum Opinion) in which Lighthouse and its counsel should have recognized that they had failed to produce the Escrow Account statements, the Court is highly skeptical that it wasn't until November 7, 2010 that the non-production was discovered.  Nevertheless, it is clear that by November 7, 2010, Lighthouse determined that only Account #2462 had been turned over.

explain the discrepancy between his November 7, 2010 "realization" and his statements in the November 11, 2010 Akerly Email.  *Id.*  Mr. Akerly was unable to offer an adequate explanation and instead, essentially, repeated the same conjectures.

## Analysis

Federal Rules 37(b) and (c) provide the authority for the sanction at issue in this case. Fed. R. Civ. P. 37(b) and (c).  These rules are made applicable to this adversary proceeding by Fed. R. Bankr. P. 7037.  *See also Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990) (citations omitted) ("Rule 37 sanctions were intended to punish evasion of pretrial discovery."); *Ohio v. Arthur Anderson & Co.*, 570 F.2d 1370, 1376 (10th Cir. 1978) ("Enforcement of the rules [of civil procedure] requires sanctions for disobedience of valid court orders.").

Federal Rule of Civil Procedure 37(b) provides, in relevant part: "If a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders . . . [including] (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims . . . ."  Fed. R. Civ. P. 37(b)(2)(A)(i).

Similarly, Rule 37(c) provides, in relevant part: "If a party fails to provide information . . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial . . . .   In addition to or instead of this sanction, the court . . . (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." Fed. R. Civ. P. 37(c)(1)(C).  Thus, Rule 37(c) permits a Rule 37(b)(2)(A)(i) sanction, a finding that a fact is established in favor of the prevailing party.  *Id.*

The Court finds Lighthouse's conduct merits sanctions under both Rules 37(b) and (c). Lighthouse misconduct throughout discovery is set forth in detail above and is summarized as follows:

- Lighthouse did not produce the Escrow Account statements requested by the Harmons in the subpoena issued on July 19, 2010, and offered an inadequate and illogical explanation at the August 10, 2010 trial for the non-production.

- Lighthouse's president ignored the July 19, 2010 subpoena.  He took the unreasonable and factually incorrect position that Lighthouse had previously produced all relevant documents in state court.

- Lighthouse failed to search its own internal e-mail communications in response to the July 19, 2010 subpoena and also failed to request all the documents in Middleberg's possession.

- Lighthouse produced bank statements that were purported to represent the Escrow Account on August 18, 2010.  Lighthouse failed to mention that those statements did not represent the Escrow Account, even after being put on notice through the September 8, 2010 Motion for Leave.

- Lighthouse waited to produce the Escrow Account bank statements until November 11, 2011 despite the August 2, 2010 discovery deadline, August 10, 2010 Court order, September 8, 2010 Motion for Leave, and September 10, 2010 Court order.

- Lighthouse's counsel offered evasive and unfounded testimony in an effort to rationalize his inexcusable non-production of the Escrow Account statements, and misrepresented the facts regarding the late production in his communications with opposing counsel.

Lighthouse made—and subsequently executed—a decision not to participate in the discovery process in any meaningful way.  Lighthouse then repeatedly failed to take responsibility for its conduct, which distorted the facts of the case.  Litigants' meaningful participation in the discovery process is a critical element to the fair and expeditious resolution of disputes.  *Bell v. Ameritech Sickness and Acc. Disability Ben. Plan*, 2010 WL 4244126, at *10 (6th Cir. 2010) (Norris, J., dissenting) ("[T]he spirit of the Federal Rules of Civil Procedure . . . contemplate cooperation among counsel in matters involving discovery so that costly, time-consuming litigation can be avoided.").  Lighthouse's unwavering misconduct during discovery

greatly impeded the Court's ability to reach a quick and just decision on the merits of this case. Thus, Rule 37 sanctions are appropriate.

Lighthouse's most egregious and inexcusable conduct concerned the repeated non-production of Escrow Account bank statements.  On August 10, 2010 the Court informed Lighthouse that that the statements should have been produced by the August 2, 2010 discovery deadline and admonished Lighthouse for its non-production.  It was, however, not until November 11, 2010—after Lighthouse ignored both Court orders and numerous opportunities to produce the documents—that the Escrow Account was finally produced.  The Court finds it appropriate, therefore, to direct the sanction towards facts related to the Escrow Account.[28] Accordingly, under Rule 37, the Court finds that Lighthouse never established the Escrow Account.

## Conclusion

Lighthouse's motion for reconsideration is denied.    The Court deems it to be a fact that Lighthouse did not establish an escrow account in accordance with its obligations under its loan agreement with the Harmons.

SIGNED **January 26, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

---

[28] In sanctioning Lighthouse, the Court is mindful of the totality of Lighthouse's conduct throughout discovery and does not mean to diminish Lighthouse's misconduct that was not related to the Escrow Account.  To the contrary, the sanction is directed towards the Escrow Account because the most severe discovery abuses were related to the account.