

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
02/17/2011

| | | |
|---|---|---|
| **IN RE:** | § | |
| **HILLARY DURGIN HARMON,** | § | **Case No. 10-33789** |
| Debtor(s). | § | |
| | § | **Chapter 11** |
| | § | |
| **HILLARY DURGIN HARMON,** *et al,* | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **Adversary No. 10-03207** |
| | § | |
| **LIGHTHOUSE CAPITAL FUNDING,** | § | |
| **INC.,** | § | |
| Defendant(s). | § | **Judge Isgur** |

## MEMORANDUM OPINION

For the reasons set forth below, the Court holds: (i) the lien held by Lighthouse Capital Funding, Inc. on the Harmons' homestead is invalid; (ii) Lighthouse is entitled to equitable subrogation in the principal amount of $986,992.06 plus 6% interest (accrued from April 23, 2008); (iii) Lighthouse must pay the Estate $179,413.91 in statutory damages under the Truth in Lending Act ("TILA"); and (iv) the Estate is entitled to reimbursement for reasonable legal fees and costs (in an amount to be determined at a post-judgment hearing) under TEX. CIV. PRAC. & REM. CODE § 37.009 and TILA § 1640(a)(4).

## BACKGROUND

This case arose out of a mortgage refinance transaction between the Harmons and Lighthouse. When the Harmons first encountered Lighthouse in March 2008, the Harmons owed approximately $986,000.00 on their existing mortgage, which was held by Fix Funding, L.L.C. The Harmons hoped to obtain a home equity loan of up to $500,000.00 from Lighthouse.

Lighthouse was initially amenable to paying off the Harmons' existing mortgage and advancing additional funds to the Harmons at closing. In particular, Lighthouse contemplated lending $1,250,000.00 to the Harmons. *See* Harmons' Ex. 3. The proposed $1,250,000.00 loan was for a one year period at a 14% interest rate. *Id.* It included a prepayment of 6 months interest and a cash out of $50,000.00 to Mr. Harmon at closing. *Id.*

Lighthouse sought the guidance of outside counsel concerning the legality of the proposed $1,250,000.00 loan. Lighthouse's counsel advised that—since Lighthouse was not licensed to provide home equity loans in Texas—Lighthouse could not legally transfer any cash to Mr. Harmon at closing. *Id.* Lighthouse's counsel recommended that the proposed loan should be re-structured so that Mr. Harmon did not receive any cash at closing. *Id.*

Lighthouse then informed Mr. Harmon that it was not licensed in Texas to provide him with a home equity loan. *See also* Trial Tr. vol. 1, 17:3-8, Aug. 10, 2010 (Lighthouse's president testifying that "Lighthouse is not a licensed lender in Texas")[1]; *id.* at 57:20-24. Lighthouse proposed moving forward with a refinance transaction that did not include any cash-out to the Harmons at closing. Mr. Harmon consented to doing so and the parties eventually reached an agreement.

On April 18, 2008, Mr. Harmon signed[2] a promissory note payable to Lighthouse for the principal amount of $1,268,598.87 in exchange for Lighthouse's agreement to lend him $1,268,598.87. Harmons' Ex. 29. The promissory note was secured by a deed of trust on the Harmons' homestead. Harmons' Ex. 31.

---

[1] The first volume of the August 10, 2010 trial transcript was filed at ECF No. 31.

[2] Mr. Harmon's wife signed the deed of trust but did not sign the promissory note. *See* Harmons' Exs. 29, 31.

On April 23, 2008, the Harmons closed on the $1,268,598.87 loan with Lighthouse. Lighthouse wire transferred $1,026,383.04 of the loan proceeds to Fidelity National Title ("Fidelity"). Fidelity disbursed $986,992.06 to the then-existing lienholder on the Harmons' homestead, Fix Funding, L.L.C., in full satisfaction of the Harmons' debt to Fix Funding. In addition to the $986,992.06 payoff to Fix Funding, the following "settlement charges" were paid out of the loan proceeds:

- A 12 month **interest prepayment of $177,715.83** was paid to Lighthouse[3];

- A $52,000.00 loan origination fee was paid to Lighthouse;

- A $26,000.00 broker origination fee was paid to the Harmons' mortgage broker;

- $12,500.00 in "Legal/Travel/Processing Fees" were paid to Lighthouse;

- A $5,529.00 hazard insurance premium was paid to Farmers;

- A $3,982.00 title insurance fee was paid to Fidelity;

- $1,977.00 was paid to Broadacres Community Association;

---

[3] Pursuant to the Escrow Arrangement and Agreement executed by Lighthouse and Mr. Harmon, Lighthouse was obligated to place the $177,715.83 "in escrow in a federally insured account in the name of the holder of the Loan (transferable as is necessary to said holder's servicing agent) . . . [and to use the funds] to make the interest payments due during the period commencing on the first payment date specified in the Note . . . and ending on the Maturity Date." *See In re Harmon*, 2011 WL 302859, at *2 ("*Harmon II*") (Bankr. S.D. Tex. Jan. 26, 2011); *see also* Harmons' Ex. 26. Thus, "$177,715.83 of the $1,268,598.87 was to be held in an escrow account . . . and [$14,800.32] of the $177,715.83 was then to be applied each month towards the Harmons' monthly interest payment." *Harmon II*, 2011 WL 302859, at *2. On November 19, 2010, as a sanction for Lighthouse's abusive conduct during the discovery process in this case, the Court found that Lighthouse failed to establish an escrow account containing the $177,715.83. *See id.* at *28. Since the funds were deemed never to have been placed in escrow but instead retained by Lighthouse, the $177,715.83 constituted a prepayment of the interest due each month over the 12-month course of the loan.

Throughout this opinion, the Court refers to the $177,715.83 payment as an interest prepayment. However, at the time the loan closed and the Escrow Arrangement and Agreement was executed, the parties did not necessarily understand that the $177,715.83 payment constituted an interest prepayment. Nevertheless, since the Court has already determined (in its November 19, 2010 order sanctioning Lighthouse) that the $177,715.83 transfer was an interest prepayment, it need not reach the more difficult questions surrounding the Escrow Arrangement and Agreement. For example, the Court need not determine whether (i) notwithstanding the sanction, Lighthouse actually failed to establish an escrow account, or (ii) assuming Lighthouse did comply with the Escrow Arrangement and Agreement, the Escrow Arrangement and Agreement nevertheless constituted an interest prepayment.

As will be discussed below in Section 3, the fact that an interest prepayment occurred is legally significant because it exposes Lighthouse to additional theories of liability under TILA.

- $686.00 in legal and recording fees were paid to the Laird Law Firm, P.C.;

- $575.00 in legal and closing fees were paid to the Laird Law Firm, P.C.;

- A $377.40 endorsement fee was paid to Fidelity;

- $168.00 in recording fees were paid to the Laird Law Firm, P.C.;

- A $71.58 tax certificate payment was paid to National TaxNet;

- A $20.00 "Notice of Restrictions" was paid to the Laird Law Firm, P.C.;

- A $5.00 State of Texas Guaranty Fee was paid to the state of Texas[4];

*See* Harmons' Exs. 21, 23.

Under the terms of the promissory note, Mr. Harmon was obligated to make "interest only [monthly payments] for the first 11 months" of the loan period. Harmons' Ex. 29. The interest rate was 14% and the interest payment due each of the first 11 months was $14,800.32. *Id.* On the twelfth month, in addition to a $14,800.32 interest payment, Mr. Harmon was also obligated to pay the outstanding principal balance of $1,268,598.87 in full.[5] *Id.*

The loan was structured, however, to enable Mr. Harmon to borrow against the equity in his home so that all of the interest due over the course of the 12 month loan period would be paid in advance at the loan's closing. As stated above, Mr. Harmon borrowed $986,992.06 from Lighthouse to satisfy the lien held by Fix Funding. Mr. Harmon also borrowed an additional $177,715.83 from Lighthouse that was then paid to Lighthouse at the loan's closing.[6] This

---

[4] Harmons' Ex. 21, Fidelity's loan settlement statement, lists the State of Texas Guaranty Fee at $6.00. Harmons' Ex. 23, the final check register, lists "Guaranty Fees" at $5.00. The exact amount of the fee is irrelevant to the computation of any damages owed to the Harmons. The Court nevertheless finds the fee was $5.00 because otherwise the total payments out of the loan proceeds exceed the total balance of the loan by $1.00.

[5] An addendum to the promissory note provided that Mr. Harmon could extend the maturity date of the loan for one year by making a $60,000.00 extension fee payment to Lighthouse. Harmons' Ex. 30.

[6] As set forth below, Lighthouse refunded half of the $177,603.84 payment to the Harmons less than 3 months after the loan was closed.

4

$177,715.83 was secured by the Harmons' homestead and it was paid to Lighthouse to satisfy all of the interest due over the 12-month course of the loan. Thus, at the time he closed on the loan, Mr. Harmon had completely satisfied his interest obligation on the loan and only owed the outstanding principal amount of $1,268,598.87.[7]

To be sure, Mr. Harmon did not receive any cash at the closing. Instead, through the $177,715.83 prepayment, Mr. Harmon received the freedom from making any payments to Lighthouse until the principal balance became due one year later. Both the Harmons and Lighthouse were aware of the unique nature of this transaction when the loan was closed.[8]

It is also noteworthy that the title insurance policy Fidelity issued at closing was in the amount of $1,090,883.04. Harmons' Ex. 27. The policy excluded the $177,715.83 interest prepayment. Trial Tr. vol. 2, 92:4-6, Aug. 10, 2010[9]; Trial Tr. vol. 1, 46:4-8, Aug. 10, 2010

---

[7] $14,800.32 multiplied by the 12 month loan period equals $177,603.84. Mr. Harmon prepaid $177,715.83 in interest at the closing of the loan. Thus, once he closed on the loan, Mr. Harmon was not required to make any additional interest payments over the course of the loan.

[8] As mentioned above in footnote 3, the Harmons and Lighthouse had executed the Escrow Arrangement and Agreement on April 18, 2008. Harmons' Ex. 26. The escrow agreement essentially provided that the $177,715.83 would be held in escrow by Lighthouse, and that $14,800.32 would be deducted from the escrow account each month in order to satisfy the monthly payment due to Lighthouse. *Id.* Thus, from the prospective viewpoint at the time the loan closed on April 23, 2008, both parties did not necessarily understand that the Harmons were prepaying all of their interest obligations at that time. Both parties simply understood (on April 23, 2008) that $177,715.83 would be held in escrow and applied according to the terms of the Escrow Arrangement and Agreement.

The Court has since determined, however, that Lighthouse failed to establish the escrow account. *Harmon II*, 2011 WL 302859, at *28. Accordingly, the $177,715.83 payment that should have been placed in escrow by Lighthouse is deemed to have been applied by Lighthouse as an interest prepayment at the time the loan closed.

Although, as set forth below in Section 3, the legal ramifications of this distinction (between interest being held in escrow and interest being prepaid at closing) are potentially significant, practically speaking, Mr. Harmon received the freedom from making any monthly payments on the loan due to his transfer of the $177,715.83 to Lighthouse at the loan's closing. Regardless of whether Lighthouse maintained the $177,715.83 in an escrow account or simply applied the $177,715.83 as an interest prepayment, under either scenario (the latter being the scenario that actually unfolded), Mr. Harmon would not owe Lighthouse any payments until the principal balance became due one year after the loan's closing.

[9] The Court refers to this portion of the August 10, 2010 trial transcript as volume 2 because another portion of the trial was previously transcribed and filed at ECF No. 31.

On June 24, 2008, Mr. Harmon sent a letter to Lighthouse that provided, in relevant part: "Please accept this letter as my formal request, *pursuant to our agreement*, that immediately after the crediting of the July 1, 2008 payment, Lighthouse release to me six months of escrow payments tendered to Lighthouse at the closing of this loan."  Lighthouse's Ex. 53 (emphasis added).   Later that same day, Mr. Harmon sent a second letter to Lighthouse that stated, in relevant part: "Please accept this letter as my formal request, that immediately after the crediting of the July 1, 2008 payment, *Lighthouse agree to a loan modification* allowing for the release of six months of escrow payments tendered to Lighthouse at the closing of this loan."  Lighthouse's Ex. 54 (emphasis added).  Mr. Harmon testified that he sent the second letter because Lighthouse "didn't like the language 'pursuant to our agreement'" in the first letter.  Trial Tr. vol. 2, 72:10-11, Aug. 10, 2010.  Lighthouse had requested that Mr. Harmon redraft the letter and remove the language referencing an agreement.  *Id.* at 72:13-19.  Mr. Harmon testified that he did not have an actual agreement with Lighthouse but just wanted the money; Mr. Harmon willingly complied with Lighthouse's request for a second letter.  *Id.*

On July 8, 2008, Lighthouse wire transferred $88,801.92 to the Harmons.  Lighthouse's Ex. 55.  The $88,801.92 was drawn from the $177,715.83 in prepaid interest that the Harmons previously paid to Lighthouse.  This reduced the 12-months of prepaid interest to a 6-month interest prepayment.[10]

After the $88,801.92 transfer, the Harmons' first $14,800.32 monthly interest payment became due on December 1, 2008.[11]   The Harmons did not make the December monthly

---

[10] Mr. Leshgold, Lighthouse's president, testified that Lighthouse transferred the $88,801.92 to Mr. Harmon because "[u]p to that point he had been a good borrower . . . .  And it was my sense that we were refunding that money to him so he could go out and get a take-out and refinance us out."  Trial Tr. vol. 1, 69:24-70:2, Aug. 10, 2010.

[11] A $3,834.76 partial interest payment became due to Lighthouse on November 1, 2008.  Lighthouse's Ex. 56.  This became due because after (i) the Harmons received the $88,801.92 wire transfer on July 8, 2008, and (ii) the three $14,800.32 interest prepayments were applied for the months of August through October 2008, there was only

payment or any other monthly payment thereafter.  Thus, the only monthly interest payments made by the Harmons were those that they prepaid at the loan's closing.  Trial Tr. vol. 2, 142:4-7, Aug. 10, 2010.  Inasmuch as the Harmons never made a single payment on the loan, the Court question's Leshgold's statement (referenced in footnote 10) that Mr. Harmon had been a good borrower.  The Harmons had not yet demonstrated any performance on the loan.

Litigation ensued after Lighthouse posted the Harmons' homestead for foreclosure.[12]  *Id.* at 142:11-144:22.  The Harmons originally initiated this lawsuit against Lighthouse in state court on April 16, 2010.  Mr. Harmon's wife, Hillary Harmon, then filed a chapter 11 bankruptcy petition on May 4, 2010.  The Harmons removed the state court lawsuit to this Court on May 10, 2010.

On July 8, 2010, the Harmons filed their First Amended Complaint ("Complaint") in this adversary proceeding.  ECF No. 13.  The Complaint asserts claims against Lighthouse for fraud, usury, deceptive trade practices, negligent misrepresentation, conversion, theft, unreasonable collection practices, and negligent debt collection.  *Id.*  In addition to damages, the Harmons seek a declaratory judgment that the Lighthouse loan constitutes an illegal home equity loan that is void under Texas law.  *Id.*  Also, the Court subsequently granted the Harmons leave to amend their Complaint to include a claim that Lighthouse violated § 1639(g) of the Truth in Lending Act.  ECF Nos. 50, 51.  The Harmons filed their amended Complaint on November 11, 2010.  ECF No. 63.

---

$10,965.56 in prepaid interest remaining in the Lighthouse account holding the Harmons' prepaid interest.  Then, on November 1, 2008, a $14,800.32 interest payment became due.  Since the Harmons only prepaid $10,965.56 of the interest due on November 1, 2008, a $3,834.76 shortfall arose that the Harmons were obligated to pay on that date.  The Harmons never paid any portion of the $3,834.76.

[12] The prior state court litigation was primarily aimed at staving off Lighthouse's foreclosure efforts.  But for issues concerning the statute of limitations of the Harmons' claim under the Truth in Lending Act, set forth in Section 3(a) below, the prior litigation is irrelevant for the purposes of this opinion.

This case went to trial on August 10, 2010. The evidentiary portion of the trial was continued to and completed on November 19, 2010. The Court heard closing arguments on December 21, 2010. The parties have also submitted trial and post-trial briefs. ECF Nos. 70, 92, and 97.

A N A L Y S I S

For the reasons set forth below, the Court holds: (i) Lighthouse's lien on the Harmons' homestead is invalid; (ii) Lighthouse is entitled to equitable subrogation in the principal amount of $986,992.06 plus 6% interest (accrued from April 23, 2008); (iii) Lighthouse must pay the Estate $179,413.91 in statutory damages under TILA; and (iv) the Estate is entitled to reasonable legal fees and costs (in an amount to be determined at a post-judgment hearing) under TEX. CIV. PRAC. & REM. CODE § 37.009 and TILA § 1640(a)(4).

## 1. Lighthouse's Lien is Invalid Under Texas Law

The primary relief that the Harmons seek is a declaratory judgment. Specifically, the Harmons request a declaration that (i) the Harmons' loan constitutes an illegal home equity loan, (ii) Lighthouse failed to comply with Texas law concerning home equity loans, (iii) Lighthouse's lien is void, (iv) Lighthouse has forfeited the right to recover principal and interest, and (v) Lighthouse's proof of claim in Ms. Harmon's bankruptcy case is void and disallowed. ECF No. 13.

The parties agree that they entered into a transaction to refinance the Harmons' existing deed of trust. The parties also agree that the Harmons' loan was not a valid home equity loan. They agree, for example, that the Harmons' loan was not in compliance with Article 16, Section 50(a)(6) of the Texas Constitution, which regulates home equity loans. The parties disagree, however, over whether the refinance transaction nevertheless violated Texas home equity laws.

8

Lighthouse contends that the refinance transaction was a legal, "straight rate" or "rate and term" transaction.[13]  In support of its theory, Lighthouse points to the facts that (i) Mr. Harmon did not receive any cash at the loan's closing and (ii) the loan documents explicitly provided that the transaction was not a home equity loan under Texas law.  Essentially, Lighthouse argues that the Harmons' loan was not a home equity loan and, therefore, it could not have violated home equity lending restrictions.

The Harmons assert, on the other hand, that the transaction was manufactured by Lighthouse in an effort to circumvent Texas law governing home equity loans.  According to the Harmons, once Lighthouse determined that it was not licensed to provide home equity loans in Texas, Lighthouse concocted an illegal interest prepayment scheme that enabled the Harmons to borrow against the equity in their homestead.  In the alternative, the Harmons contend that Lighthouse's lien is invalid under the constitutional provisions regulating straight rate refinance transactions.

Article 16 § 50 of the Texas Constitution establishes limitations on the types of liens that can be placed on a Texas homestead.  Any lien that fails to comply with the requirements of Article 16 § 50 of the Texas Constitution is void.  *Doody v. Ameriquest Mort. Co.*, 49 S.W.3d 342, 349-50 (Tex. 2001) ("Any attempt to mortgage homestead property, except as approved by the Texas Constitution, is void."); *RepublicBank, Lubbock, N.A. v. Daves (In re Daves)*, 770 F.2d 1363, 1367 (5th Cir. 1985) ("Texas law . . . militates strongly against the establishment of any lien which is not created according to statutory and constitutional requirements.").  Section 50(c) cements this point: "No mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section  . . . ."  Tex. Const. art. XVI, § 50(c).

---

[13] In its simplest form, a straight rate transaction is a refinance transaction that does not provide a cash-out to the borrower.  In essence, it is a standard refinance transaction.

9

The Court must therefore look to the Texas Constitution and determine whether the Harmons' mortgage fits within the section establishing the legal parameters for a refinance transaction. Section 50(a)(4) provides the general rule that refinancing a lien against a homestead is permissible. *Id.* at § 50(a)(4). Section 50(e) sets forth specific limitations on the amount of funds that can be lent in such a transaction:

> "A refinance of debt secured by a homestead and described by any subsection under Subsections (a)(1)-(a)(5) that includes the *advance of additional funds* may not be secured by a valid lien against the homestead unless:
>
> (1) the refinance of the debt is an extension of credit described by Subsection (a)(6) of this section; or
>
> (2) the advance of *all the additional funds* is for reasonable costs necessary to refinance such debt or for a purpose described by Subsection (a)(2), (a)(3), or (a)(5) of this section.

*Id.* at § 50(e) (emphasis added).

The Harmons' loan is a refinance of debt described in § 50(a)(4). There is no doubt that the $1,268,598.87 loan—which refinanced an existing lien held by Fix Funding in the amount of $986,992.06—included the advance of additional funds. *See Meador v. EMC Mortg. Corp.*, 236 S.W.3d 451, 453 (Tex. App.—Amarillo 2007, pet. denied) ("'[A]dditional funds' are monies obtained in excess of the pre-existing debt being refinanced, and when the two are combined, the repayment of the total is to be secured by a lien on the homestead."). Accordingly, the Court must determine whether the refinance transaction satisfies either §§ 50(e)(1) or (e)(2).

### a. The Harmons' Loan Does not Satisfy § 50(e)(1)

Section 50(e)(1) incorporates § 50(a)(6), which delineates the rules governing home equity loans. Lighthouse acknowledges that it has not complied with the Texas provisions governing home equity loans, including § 50(a)(6). *See also* Trial Tr. vol. 1, 17:1-19:11, Aug.

10

10, 2010; Harmons' Ex. 3.  For instance, the Harmons' loan (i) is not "without recourse for personal liability" as required by § 50(a)(6)(C); (ii) includes certain fees in excess, "in the aggregate, [of] three percent of the original principal amount of the extension of credit" as prohibited by § 50(a)(6)(C); and (iii) was made by an entity that is not authorized to make home equity loans in contravention of § 50(a)(6)(P).  *See* TEX. CONST. art. XVI, § 50(a)(6)(C), (E) and (P);  *see also* Lighthouse's Ex. 1.  Lighthouse argues that the loan was structured as a straight rate refinance transaction and was never intended to be a home equity loan.  Since the Harmons' loan was a straight rate loan, Lighthouse's contends that its failure to comply with the Texas Constitutional provisions governing home equity loans is irrelevant.

### i.  The Harmons' Loan was not an Extension of Credit Under § 50(a)(6)

The Court agrees with Lighthouse that the Harmons' loan was not a home equity loan. The evidence indicates that the parties originally sought to enter into a home equity loan transaction.  However, once Lighthouse was advised that it was not permitted to provide home equity loans in Texas, Lighthouse changed course.  Lighthouse informed Mr. Harmon that it could not provide him with a home equity loan and that any cash-out at closing was prohibited by the Texas Constitution.  Mr. Harmon understood this restriction and could have terminated negotiations with Lighthouse upon Lighthouse's disclosure of the restriction.   Instead, Mr. Harmon and Lighthouse voluntarily and knowingly proceeded to negotiate a straight rate refinance transaction.

The loan documents provide additional support for this conclusion.  For example, the last page of the deed of trust provides, directly above the Harmons' signatures: "28.  Loan Not a Home Equity Loan.  The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution."  Lighthouse's

11

Ex. 2.  Furthermore, both Mr. Harmon and Lighthouse entered into the Escrow Arrangement and Agreement in order to enable the Harmons to borrow additional funds without violating § 50(a)(6).   Mr. Harmon is a former attorney (although now disbarred) and a relatively sophisticated borrower.  He understood that Lighthouse could not provide him with a home equity loan and willingly assented to the Escrow Arrangement and Agreement, which enabled Mr. Harmon to prepay all of the interest due over the course of the loan at closing.  Similarly, Lighthouse entered into the Escrow Arrangement and Agreement after being advised by outside counsel that, although a cash-out to Mr. Harmon at closing was prohibited, the escrow arrangement was permissible in a straight rate refinance transaction.

The Court also finds that the parties not only sought to facilitate the Harmons' borrowing of additional funds without violating § 50(a)(6); they succeeded in doing so.  The Harmons have not cited one case for the proposition that a homestead refinance transaction, which includes an interest prepayment, constitutes an illegal home equity loan.

This is not to say, conversely, that the Harmons' loan is valid—as set forth above, a lien is void if it does not comply with the Texas Constitution.  The parties' execution of a loan that did not violate § 50(a)(6) does not compel the conclusion that the lien is valid.  It simply compels the conclusion that the loan was neither intended to be in compliance with § 50(a)(6) nor in actual violation of § 50(a)(6).  The loan simply was not structured to be governed by § 50(a)(6).

### ii.  The July 8, 2008 transfer of $88,801.92 Yields Inconclusive Evidence

Additionally, the Court notes that the July 8, 2008 wire transfer of $88,801.92 from Lighthouse to the Harmons both supports and hinders the Harmons' position.  Therefore, the Court finds that the transfer is largely inconsequential to the resolution of this § 50(a)(6) question.

12

On the one hand, it is disconcerting that Mr. Harmon, who originally wanted a cash-out at closing, received cash from Lighthouse less than 3 months after the loan closed.  Mr. Harmon's first letter to Lighthouse, which referenced an agreement to refund prepaid interest post-closing, raises similar concerns.  *See* Lighthouse's Ex. 53.  On the whole, these facts evidence the parties' mutual desire enter into a home equity refinance transaction while circumventing the Texas home equity laws.

Conversely, Mr. Harmon testified that he did not have an agreement with Lighthouse regarding a post-closing cash transfer.  The second letter Mr. Harmon sent on June 24, 2008, which requested that "Lighthouse *agree to a loan modification* allowing for the release of six months of escrow payments tendered to Lighthouse at the closing of this loan," corroborates Mr. Harmon's testimony and supports the conclusion that there was no prior agreement. Lighthouse's Ex. 54 (emphasis added).

The conclusion is further augmented by the Loan Agreement Rider executed by Mr. Harmon and Lighthouse on April 18, 2008.  *See* Lighthouse's Ex. 55.  The Loan Agreement Rider provided that the Harmons' written loan agreements superseded any prior oral agreements, and that the loan agreements may not be varied through oral agreements or discussions.  *Id.*

Overall, it appears that there was a discussion at some point concerning a post-closing cash-out but there was not an agreement to that effect.  There is evidence that the parties intended to circumvent the home equity laws; however, there is also evidence that Lighthouse subsequently agreed to modify the Harmons' loan and refund half of the prepaid interest.  The Harmons have not persuaded the Court that these facts demonstrate that the straight rate refinance transaction was actually an illegal home equity loan.

### iii.   Conclusion

The Harmons have lost the first battle by failing to sustain their burden of proof that the loan violated § 50(a)(6).   The Harmons have not lost the war, however, over the validity of Lighthouse's lien.   Since the Harmons' loan included the advance of additional funds and is not an extension of credit governed by § 50(a)(6), Lighthouse's lien is invalid under § 50(e) unless it comports with § 50(e)(2).

### b.   The Harmons' Loan Does not Satisfy § 50(e)(2)

Section 50(e)(2) provides that a lien on a debtor's homestead that includes the advance of additional funds is valid so long as "the advance of *all* the additional funds is for *reasonable* costs *necessary* to refinance such debt or for a purpose described by Subsection (a)(2), (a)(3), or (a)(5) of this section." TEX. CONST. art. XVI, § 50(e)(2) (emphasis added).

Subsections (a)(2), (a)(3), and (a)(5) do not apply in this case.[14]   Lighthouse's lien is therefore invalid unless the Court finds that the advance of all additional funds was for costs that were both reasonable and necessary for refinancing the Harmons' debt to Fix Funding.   The Court finds that the Lighthouse loan included advances to cover costs that were neither necessary nor reasonable.   Accordingly, the Court holds that Lighthouse's lien on the Harmons' homestead is invalid.

### i.   The Harmons Were Advanced Funds for Unnecessary Costs

Section 50(e)(2) mandates that all of the additional funds advanced by Lighthouse must have been for costs that were *both* "reasonable" and  "necessary" for the execution of a straight rate refinance of the Harmons' debt.   *See id.*   The Court holds that Lighthouse's advance of

---

[14] Subsections (a)(2), (a)(3), and (a)(5) concern debts incurred (i) for the payment of taxes due on the homestead, (ii) as a result of a property division in divorce, and (iii) to finance repairs or improvements on the homestead, respectively.  None of these subsections apply to the Harmons' debt to Lighthouse.

$177,715.83 to cover the interest due over the course of the Harmons' loan was not a necessary cost for the execution of a straight rate refinance transaction.  The Court notes that Lighthouse's defense focuses—almost exclusively—on the reasonableness of the $177,715.83 payment.  However, items that are reasonable—but not necessary—do not qualify under § 50(e)(2).

In order to correctly apply § 50(e)(2), the Court must first evaluate the meaning of the term "necessary."[15]  The Court's analysis is guided by foundational principles of constitutional interpretation.

When interpreting the Texas Constitution, courts "rely heavily on its literal text and must give effect to its plain language."  *Doody*, 49 S.W.3d at 344.  Courts must also "construe constitutional provisions and amendments that relate to the same subject matter together and consider those amendments and provisions in light of each other."  *Id.*

According to Webster's Dictionary, the term "necessary" is defined as "1. Being such in its nature that it must exist, occur, or be true; inevitable.  2.  Absolutely needed to accomplish a desired result."  The New Int'l Webster's Concise Dictionary (1st. ed. 1998).  Furthermore, after reviewing the usage of the term "necessary" throughout Article 16 of the Texas Constitution, the Court has concluded that the term is used to denote an action that *must occur* or a cost that *must be incurred* to *achieve a desired result*.[16]

---

[15] Section 50(e)(2) is discussed in only a handful of cases, none of which define the term "necessary."

[16] For instance, § 50(a)(6)(E) provides that an extension of credit must "not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are *necessary* to originate, evaluate, maintain, record, insure or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount" of the loan.  TEX. CONST. art. XVI, § 50(a)(6)(E) (emphasis added).  Section 50(a)(6)(E)'s meaning is unchanged when the Court inserts its construction of the term "necessary": § 50(a)(6)(E) provides that the total amount of fees that *must* be incurred *to achieve the desired result* of obtaining and maintaining an extension of credit must not exceed 3% of the principal loan balance.

Similarly, § 50(p)(5) provides one of the methods for making an advance on a reverse mortgage: "at any time by the lender, on behalf of the borrower, if the borrower fails to timely pay [any taxes, insurance, costs of repair or maintenance, assessments, and senior lien] that the borrower is obligated to pay under the loan documents to the extent *necessary* to protect the lender's interest in or the value of the homestead property."  *Id.* at § 50(p)(5)

15

The Court must next consider whether all of the additional funds advanced by Lighthouse were for costs that *must have been incurred to achieve the parties' desired result* of executing a straight rate refinance transaction. The Court finds that the 12-month interest prepayment of $177,715.83 that the Harmons paid to Lighthouse was not a cost the Harmons needed to incur to obtain a straight rate refinance transaction. Instead, this was a cost that Mr. Harmon admittedly sought and willingly paid because the Harmons wanted to borrow against the equity in their homestead.

Lighthouse accommodated the Harmons' desire to borrow against their homestead equity by advancing funds to completely satisfy the first 11 monthly payments (and all 12 of the interest payments) due on their loan. There is no evidence, however, that Lighthouse forced the Harmons to borrow the $177,715.83 as a necessary condition to obtaining the loan.[17]

In fact, Lighthouse had originally planned to advance a 6-month interest prepayment to the Harmons as opposed to a 12-month prepayment. *See* Harmons Ex. 3; Lighthouse's Ex. 40. The primary reason Lighthouse's advance was extended to 12-months in prepaid interest was due to Mr. Harmon's desire to borrow against additional equity and Lighthouse's inability to provide a cash out at the loan's closing. Lighthouse's business decision to accommodate Mr. Harmon's wish did not give rise to a necessary cost associated with executing a straight rate refinance transaction.

---

(emphasis added). Thus, the lender is permitted to advance funds that *must* be paid *to achieve the desired result* of protecting the lender's interest in the collateral.

[17] Even if Lighthouse had forced the Harmons to borrow $177,715.83 in prepaid interest as a condition for obtaining the loan, the Court would remain hesitant to conclude that such a cost was necessary. For, if other lenders were willing to enter into a straight rate refinance transaction with the Harmons without requiring any prepaid interest, then the prepaid interest would not have been needed to accomplish the desired result (i.e. unnecessary). In any evident, Lighthouse did not present any evidence that the advance of $177,715.83 must have been incurred for them to obtain a straight rate loan.

16

Additional proof of the lack of necessity of the $177,715.83 cost is found in that fact that Lighthouse refunded $88,801.92 of the prepaid interest less than three months after the loan closed.  Had this been a necessary cost—such as a title insurance or recording fee—it certainly would not have been refunded to the Harmons shortly after the loan closed.[18]

The Court holds that Lighthouse's advance of $177,715.83 to cover the interest due over the course of the Harmons' loan was not a necessary cost for the execution of a straight rate refinance transaction.  Section 50(e)(2) mandates, in relevant part, that all costs must be reasonable costs necessary to refinance the borrower's debt.  The Harmons' loan therefore fails to satisfy § 50(e)(2).

### ii.  The Harmons Were Advanced  Funds for Unreasonable Costs

The Court also finds that Lighthouse's advance of $177,715.83 constitutes an unreasonable cost under § 50(e)(2).  The Court's conclusion is based upon § 153.41 of the Texas Administrative Code—which is titled, "Refinance of a Debt Secured by a Homestead: Section 50(e)."

Section 153.41 provides:

> (1) Reasonableness and necessity of costs relate to the type and amount of the costs.
>
> (2) In a secondary mortgage loan, reasonable costs are those costs which are lawful in light of the governing or applicable law that authorizes the assessment of particular costs. In the context of other mortgage loans, *reasonable costs are those costs which are lawful in light of other governing or applicable law.*
>
> (3) Reasonable and necessary costs to refinance may include reserves or impounds (escrow trust accounts) for taxes and insurance, if the reserves comply with applicable law.

---

[18] Moreover, the Court finds that Lighthouse's after-the-fact rationale for the refund is incredible.  Lighthouse ostensibly refunded the cash because Mr. Harmon was a good borrower.  The only evidence of Mr. Harmon's status as a good borrower was his acceptance of the loan—but for the prepaid interest, Mr. Harmon failed to make any payments on the loan.

7 TEX. ADMIN. CODE § 153.41 (2004) (emphasis added).

As discussed in greater detail below in Section 3, the Harmons' loan violated § 1639(g) of the Truth in Lending Act.  *See* 15 U.S.C. § 1639(g).  Section 1639(g) prohibited Lighthouse from consolidating "more than 2 periodic payments required under the loan" and then applying those funds as advance payments "from the proceeds of the loan provided to the consumer."  *Id.* The $177,715.83 interest prepayment Lighthouse received out of the loan proceeds clearly entailed the consolidation and advance payment of more than two monthly payments.  It, therefore, violated § 1639(g).

TILA constitutes "other governing or applicable law" for the purposes of 7 TEX. ADMIN. CODE § 153.41**.**  Lighthouse has also failed to cite any authority standing for the proposition that a 12-month interest prepayment on a homestead mortgage constitutes a reasonable cost.  Thus, pursuant to 7 TEX. ADMIN. CODE § 153.41 and in light of 15 U.S.C. § 1639(g), the Court holds that the $177,715.83 in prepaid interest was an unreasonable cost.

### iii.  Conclusion

The Harmons' loan failed to satisfy either §§ 50(e)(1) or (e)(2).  Lighthouse has not directed the Court to any other section of the Texas Constitution that protects the validity of Lighthouse's lien on the Harmons' homestead.  Accordingly, the Court holds that Lighthouse's lien on the Harmons' homestead is invalid.  *See*  TEX. CONST. art. XVI, § 50(e) ("A refinance of debt secured by a homestead and described by any subsection under Subsections (a)(1)-(a)(5) that includes the advance of additional funds may not be secured by a valid lien against the homestead unless [either Subsection (e)(1) or (e)(2) is satisfied]."); TEX. CONST. art. XVI, § 50(c) ("No mortgage, trust deed, or other lien on the homestead shall ever be valid unless it

secures a debt described by this section  . . . ."); *Doody*, 49 S.W.3d at 349-50 ("Any attempt to

mortgage homestead property, except as approved by the Texas Constitution, is void.").

### 2. Lighthouse is Equitably Subrogated to Fix Funding's Lien

The Court must next consider whether Lighthouse is equitably subrogated to the lien

previously held by Fix Funding.  Lighthouse claims that, notwithstanding the invalidity of its

lien, it is entitled to equitable subrogation because proceeds of the Harmons' loan were used to

pay the balance of the Harmons' $986,992.06 debt to Fix Funding.  For the reasons set forth

below, the Court agrees with Lighthouse and holds that it is equitably subrogated to Fix

Funding's lien.

### a. Lighthouse is Permitted to Seek Equitable Subrogation

The Court must first resolve the parties' dispute concerning whether Lighthouse may

assert the defense of equitable subrogation.  The Harmons argue that Lighthouse is not

authorized to seek equitable subrogation because it is a California entity not registered to transact

business in Texas.  The Harmons point to TEX. BUS. ORGS. CODE § 9.051(b) which provides, in

relevant part: "A foreign filing entity . . . may not maintain an action, suit, or proceeding in a

court of this state . . . on a cause of action that arises out of the transaction of business in this

state unless the foreign filing entity is registered in accordance with this chapter."  TEX. BUS.

ORGS. CODE § 9.051(b).  The Harmons contend TEX. BUS. ORGS. CODE § 9.051(b) bars

Lighthouse from seeking equitable subrogation.

The Court finds that Lighthouse is permitted to assert the defense of equitable

subrogation.  TEX. BUS. ORGS. CODE § 9.051(b) was not designed to bar a foreign creditor from

protecting its interest in collateral by asserting the defense of equitable subrogation when it is

sued in a Texas state court (or in a federal court applying Texas law).  *See State v. Cook United,*

19

*Inc.*, 463 S.W.2d 509, 516, *modified on other grounds*, 469 S.W.2d 709 (Tex. 1971) (Tex. Civ. App.—Fort Worth 1971) (quoting *State v. Martin*, 347 S.W.2d 809 (Austin Tex. Civ. App., 1961, ref., n.r.e.)) ("Appellee's right to defend such suit included the right to cross-claim and obtain affirmative judgment on such claim where the claim so asserted is incident to, connected with, arises out of, or is germane to the suit or controversy brought by the State."); *see also Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd. of the Texas Dep't of Transp.*, 179 S.W.3d 589, 612 (Tex. App.—Austin 2005, pet. denied).

### b.  Lighthouse Has Satisfied the Requirements for Equitable Subrogation

The Court must next consider whether equitable subrogation is appropriate under the facts of the case.

"Texas has long recognized a lienholder's common law right to equitable subrogation." *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618 (Tex. 2007) (citations omitted). "The doctrine allows a third party who discharges a lien upon the property of another to step into the original lienholder's shoes and assume the lienholder's right to the security interest against the debtor." *Id.* at 619 (citations omitted).

"The doctrine of equitable subrogation has been repeatedly applied to preserve lien rights on homestead property." *Id.* (citations omitted). "It has been called a legal fiction by which an obligation, extinguished by a payment made by a third person, is treated as still subsisting for the benefit of this third person." *M.D. Fleetwood v. Med Center Bank*, 786 S.W.2d 550, 553 (Tex. App.—Austin 1990, writ denied). The doctrine applies even if the refinance transaction violated the Texas Constitution. *LaSalle Bank*, 246 S.W.3d at 619 ("We have honored equitable subrogation claims against homestead property when a refinance, even though unconstitutional, was used to pay off valid liens.") (citing *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 661

(Tex. 1996)); *see also id.* at 220 ("Invalidation of a contractual lien does not preclude equitable subrogation.").

"In general, [the] purpose [of equitable subrogation] is to prevent the unjust enrichment of the debtor who owed the debt that is paid." *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex. 1993) (citing *Smart v. Tower Land and Inv. Co.*, 597 S.W.2d 333, 337 (Tex. 1980)). Equitable subrogation is inappropriate, however, if "superior or equal equities of others would be prejudiced" by its application. *Fleetwood*, 786 S.W.2d at 554 (quoting *Sanger Bros. v. Walker Dry Goods Co.*, 207 S.W. 348, 349 (Tex. Civ. App. 1918, writ ref'd)).

When a party qualifies for equitable subrogation, the party is entitled to a lien in the same amount as the previous lien plus 6% interest beginning at the time of the payoff of the previous lien. *Chase Home Fin., L.L.C. v. Cal. W. Reconveyance Corp.*, 309 S.W.3d 619, 633 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("[T]he subrogation amount is the payoff amount plus legal interest thereon from the date of payment.") (citing TEX. FIN. CODE. ANN. § 302.002 (Vernon 2006)) (remaining citations omitted). *See also* 68 Tex. Jur. 3d Subrogation § 36 (providing that a subrogee is entitled to recover the amount paid to discharge the prior obligation plus legal interest; subrogation "does not entitle the subrogee to costs or expenses, including attorney's fees") (citations omitted).

The Court holds that the equities favor subrogating Lighthouse to the prior lien of Fix Funding. Under the terms of the Harmons' loan, Lighthouse's funds were applied to payoff the $986,992.06 lien held by Fix Funding on the Harmons' homestead. Equitable subrogation exists, in part, to protect a party in Lighthouse's position by enabling it to step into Fix Funding's shoes and retain at least a portion of its invalidated lien.

Without equitable subrogation, the Harmons would reap a significant windfall. The Harmons have already obtained a substantial benefit due to the Court's invalidation of Lighthouse's lien, which included a principal balance of $1,268,598.87 plus 14% interest annually. The most Lighthouse can now recover through subrogation is the $986,992.06 payoff amount plus 6% interest. Thus, the invalidation of the lien has already greatly improved the Harmons' position vis-à-vis its obligations to Lighthouse. Granting the Harmons additional relief at Lighthouse's expense (by denying equitable subrogation) would only serve to unjustly enrich the Harmons. Equitable subrogation exists primarily to ensure that the Harmons are not unjustly enriched.

Furthermore, there are no countervailing equities that favor denying Lighthouse's request for equitable subrogation. Mr. Harmon knew Lighthouse could not provide a home equity loan in Texas. A former attorney and relatively sophisticated debtor, Mr. Harmon made the decision to work with Lighthouse in an attempt to borrow against equity in his homestead, knowing full well that Lighthouse was not licensed to provide home equity loans in Texas. The Harmons were not misled by Lighthouse; they were active participants in attempting to dodge the Texas home equity provisions. The Harmons also never made one payment to Lighthouse. It would be inequitable to let the Harmons now reap a windfall because Lighthouse failed to structure the deal in accordance with the Texas Constitution.

The Court recognizes—but rejects—the Harmons' argument that Lighthouse's discovery abuses (discussed below in Section 3) should preclude equitable subrogation. The November 19, 2010 discovery sanction was appropriate when issued and should not now be extended to make Lighthouse suffer an additional loss in excess of $1,000,000.00.

22

Accordingly, Lighthouse is equitably subrogated to Fix Funding's lien on the Harmons' homestead.  Lighthouse's lien is in the principal amount of $986,992.06 and it has been accruing interest at 6% per annum since April 23, 2008.

### 3.  Lighthouse Violated the Truth in Lending Act

The Court must next consider whether Lighthouse violated the Truth in Lending Act. The Harmons contend that Lighthouse violated § 1639(g) of TILA by charging the Harmons $177,715.83 in prepaid interest.

Section 1639(g) provides that "A mortgage referred to in section 1602(aa) of this title may not include terms under which more than 2 periodic payments required under the loan are consolidated and paid in advance from the loan proceeds provided to the consumer."  15 U.S.C. § 1639(g).

The Harmons' mortgage is covered by § 1602(aa), which provides, in relevant part:

> (1)(aa) A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling . . . if--
>
> > (A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or
> >
> > (B) the total points and fees payable by the consumer at or before closing will exceed the greater of--
> >
> > > (i) 8 percent of the total loan amount; or
> > >
> > > (ii) $400.

23

15 U.S.C. § 1602(aa).  Here, the total fees paid by the Harmons at the closing exceeded 8% of the total loan amount.[19]  Similarly, the 14% interest rate on the Harmons' loan exceeded by more than 10 points the one year Treasury bill rate on March 15, 2008.[20]  Thus, Lighthouse was required by TILA to extend credit in conformance with § 1639(g).

### a.   The Doctrine of Equitable Tolling Applies to the Harmons' TILA Claim

Lighthouse argues that § 1639(g) is nevertheless inapplicable because the one-year statute of limitations provided in § 1640(e)[21] has expired.  The Court rejects Lighthouse's theory and holds that the one-year statute of limitations is tolled under the doctrine of equitable tolling.

### i.   Critical Background Information for Understanding the TILA Claim

Before considering the merits of the equitable tolling issue, it is first necessary to explain the unique genesis of the Harmons' TILA claim.  As will be explained below, had the case developed differently—without Lighthouse's misrepresentation of evidence and the Court's sanction order[22]—it might have been more difficult for the Harmons to assert their TILA claim.  Nevertheless, the Court must apply the facts as they exist in this case and not in a hypothetical or ideal scenario.  These facts lead to the conclusion that the statute of limitations governing the Harmons' TILA claim should be equitably tolled.

On September 8, 2010, the Harmons filed a motion for leave to amend their complaint to include a cause of action under 15 U.S.C. § 1639(g).  ECF No. 41.  The Harmons' motion was

---

[19] 8% of the total loan amount of $1,268,598.87 equals $101,487.91.  This figure is less than the $177,715.83 in prepaid interest that Lighthouse charged the Harmons at the loan's closing.  The Harmons also paid $103,890.98 in other fees at their loan's closing.  Thus, the fees clearly exceed 8% of the total loan amount.

[20] *See* http://www.federalreserve.gov/releases/h15/data/Weekly_Friday_/H15_TCMNOM_y1.txt (showing, in part, that the one year treasury bill rate never exceeded 1.66% in March 2008).

[21] Section 1640(e) provides, in relevant part: "Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation . . . ." 15 U.S.C. § 1640(e).

[22] The Court's order sanctioning Lighthouse was due only in part to Lighthouse's misrepresentation of evidence.  *See generally Harmon II*, 2011 WL 302859, at *1-27.

based on the premise that Lighthouse had failed to establish the escrow account required by the Escrow Arrangement and Agreement. *See Harmon*, 2010 WL 4273078, at *1 ("*Harmon I*") (Memorandum Opinion that provides the basis for Court's order granting the Harmons leave to amend their complaint). According to the Harmons, instead of holding the funds in escrow, Lighthouse had applied the $177,715.83 as an interest prepayment. *See id.* The Harmons' motion was supported by bank statements that were purported by Lighthouse to be escrow account bank statements. *See id.* The purported escrow account statements showed that the $177,715.83 was essentially never held in escrow by Lighthouse. *See id.*

It is of critical import to note the additional background surrounding these purported escrow account statements. *See generally Harmon*, 2011 WL 302859, at *1-27 ("*Harmon II*") (Memorandum Opinion—which provides extensive background on Lighthouse's repeated failure to produce the actual escrow account bank statements—that explains the basis for Court's November 19, 2010 order sanctioning Lighthouse). The Harmons requested the escrow account bank statements before the August 10, 2010 trial but Lighthouse failed to produce them. *Id.* at *2-6. The Court ordered Lighthouse to produce the statements at trial and Lighthouse then produced the purported escrow account statements on August 18, 2010. *Id.* at *15. The Harmons' September 8, 2010 motion for leave to amend the complaint was based upon those purported escrow account statements. *Id.* at *16.

On October 22, 2010, the Court granted the Harmons leave to amend their complaint to include the claim that Lighthouse violated § 1639(g). ECF No. 51. *See also Harmon I*, 2010 WL 4273078, at *3-6. The Court granted leave because the Harmons could not have asserted the § 1639(g) claim without the escrow account bank statements, which Lighthouse failed to produce pre-trial. *Id.* at *5 ("Regardless of whether this [§ 1639(g)] allegation is true, the Court

25

determines that it is potentially meritorious and that it could not have been raised before August 18, 2010, when Lighthouse delivered the [purported escrow account] bank statements to the Harmons.").  The Court also rejected Lighthouse's claim that amendment of the Complaint was futile.  *Id.* at *4-5.  Although § 1640(e), TILA's one-year statute of limitations, had expired, § 1640(e) was subject to equitable tolling.  *Id.* at *5.  *See also id.* at *4 (rejecting Lighthouse's claim that § 1640(e) was a statute of repose).  And equitable tolling was potentially applicable here due to Lighthouse's failure to produce the escrow account bank statements pre-trial.[23]  *Id.*

On November 19, 2010, nearly a month after granting the Harmons leave to amend, the Court was informed that the bank statements produced by Lighthouse on August 18, 2010 were not the actual escrow account bank statements.  *Harmon II*, 2011 WL 302859, at *20-27. Lighthouse had misrepresented the statements produced on August 18, 2010 as the escrow account statements.  *Id.*  Lighthouse had not produced the actual escrow account bank statements until November 11, 2010.  *Id.* at *18-27.

Due to numerous discovery abuses, including Lighthouse's failure to produce the true bank statements, the Court sanctioned Lighthouse at the conclusion of the November 19, 2010 hearing.  *Id.* at 27-28.  The Court deemed it to be a fact that Lighthouse did not establish the escrow account in accordance with the Escrow Arrangement and Agreement.  *Id.*

### ii.  The Court Equitably Tolls the Harmons' TILA Claim

Lighthouse now claims that the Court should not equitably toll § 1640(e) because Mr. Harmon could have learned of the § 1639(g) cause of action during pre-bankruptcy state court litigation.  In essence, Lighthouse contends that although its conduct may have prevented

---

[23] The Court did not hold that it was tolling § 1640(e).  The Court simply held, under the applicable standard for granting leave to amend the complaint, that equitable tolling was possible and, therefore, amendment was not futile. Lighthouse remained free to challenge the applicability of equitable tolling at trial.

the Harmons from discovering their TILA claim during this case, it did not prevent the Harmons from discovering the TILA claim during prior litigation.   The Court rejects Lighthouse's theory.[24]

"Equitable tolling is the doctrine under which plaintiffs may sue after the statutory period has expired if they have been prevented from doing so due to inequitable circumstances."  *Ellis v. GMAC*, 160 F.3d 703, 706 (11th Cir. 1998).  *See also Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998) (quoting *Lambert v. United States*, 44 F.3d 296, 298 (5th Cir. 1995)) ("The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable.").  "Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights."  *Coleman v. Johnson*, 184 F.3d 398, 403 (5th Cir. 1999) (quoting *Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996)).  A "garden variety claim of excusable neglect" does not support equitable tolling.  *Id.* (quoting *Rashidi*, 96 F.3d at 128)).

In this case, during the August 10, 2010 trial, Lighthouse claimed that the Harmons requested the same material during the prior state court litigation that they requested in this case. According to Lighthouse's president, Mr. Leshgold, Lighthouse had also produced all its documents relating to the Harmons' loan during prior state court litigation:

> On three occasions, Mr. Leshgold testified that Lighthouse "produced *everything* " in the prior proceeding. Trial Tr. vol. 1, 11:10-12:5, Aug. 10, 2010 (emphasis added).  Mr. Leshgold also stated that there was "*nothing else* that [Lighthouse] had related to the case." *Id.* (emphasis added).  Mr. Leshgold's statements thus unambiguously communicated Mr. Leshgold's understanding that Lighthouse had not withheld any documents from the Harmons.

---

[24] The Court notes that a TILA claim may not have existed before this case.  It was the production of the purported escrow account statements (instead of the true escrow account statements) that led the Harmons to assert a TILA claim.

27

*Harmon II*, 2011 WL 302859, at \*14 (emphasis original).  Mr. Leshgold's statements proved inaccurate but they are nevertheless indicative of the fact that Lighthouse impeded the Harmons' ability to assert a TILA claim.  They demonstrate that Lighthouse believed it had already produced everything relevant to the escrow account in state court.  Thus, the Court finds that the Harmons could not have accessed the escrow account statements or asserted a TILA claim prior to this case.

Furthermore, during the proceedings in this case, Lighthouse originally refused to produce the escrow account statements, claiming that the statements were not covered by subpoenas issued by the Harmons.  *Id.* at \*2-6.  Lighthouse's refusal to produce the statements pre-trial was unreasonable and the Court ordered the production of the statements at the August 10, 2010 trial.  *Id.*

Lighthouse then proceeded to repeatedly squander numerous opportunities (and fail to abide by a Court order) to produce the escrow account bank statements.  *See id.* at \*9 ("The Court ordered Lighthouse to produce the missing Escrow Account statements [at the conclusion of the August 10, 2010 trial] and Lighthouse's counsel stated that they would 'endeavor' to do so."); *see also id.* \*18-27.  As explained in the Court's prior Memorandum Opinion, one blatant example of a squandered opportunity is found in Lighthouse's response to the Harmons' September 8, 2010 motion for leave to amend their complaint:

> Lighthouse completely failed to mention that the Harmons' Motion for Leave was *predicated on the wrong bank statements.*  The Motion for Leave undoubtedly put Lighthouse "on notice" that the Harmons were relying on the bank statements that were purported by Lighthouse to be the Escrow Account bank statements.  At this time, Lighthouse should have recognized its failure to produce the actual Escrow Account bank statements and brought this failure to the attention of the Harmons and the Court.  The Court concludes that it would not have been possible for Lighthouse to have reviewed the Motion for Leave without recognizing that it was

28

> premised on the wrong bank statements.  Nevertheless, Lighthouse
> did not correct its error.

*Id.* at *17 (emphasis original).

To put it plainly, Lighthouse failed to timely produce the escrow account bank statements during this litigation or prior state court litigation—even though it was required to do so. Lighthouse then inaccurately represented that they produced the escrow account statements on August 18, 2010.  It was not until after an unreasonably protracted delay that Lighthouse ultimately produced the true statements.  The Court finds that it would be highly inequitable to permit Lighthouse to benefit from its conduct by depriving the Harmons of the ability to assert their § 1639(g) claim.

Finally, it bears mention that if Lighthouse had produced the true escrow account statements within a reasonable time, in either this case or in prior cases, the statements might have reflected that Lighthouse complied with the Escrow Arrangement and Agreement.  Had such compliance been shown, the Harmons might not have been able to raise a credible § 1639(g) claim.[25]  It was Lighthouse's production of statements purported to represent the escrow account on August 18, 2010 that led to the Harmons motion to amend their complaint to include the § 1639(g) claim.  After the Harmons filed the motion to amend, which was predicated upon the wrong bank statements, Lighthouse could then have fixed its mistake by producing the true escrow account statements.  Once again, had Lighthouse produced true escrow statements reflecting Lighthouse's compliance with the Escrow Arrangement and Agreement, the Harmons might not have been able to raise a credible § 1639(g) claim and might

---

[25] The Court would have been forced to consider the more difficult question of whether the Escrow Arrangement and Agreement violated TILA.  Here, since the Court has already found that the $177,715.83 was not held in accordance with the Escrow Arrangement and Agreement, but was instead prepaid to Lighthouse at closing, the Court need only decide whether the interest prepayment violated TILA.

not have moved for leave to amend.  Instead, Lighthouse's repeated non-production of the escrow accounts resulted in the Court's sanction deeming the non-existence of the escrow account.  Lighthouse is therefore solely responsible for creating the predicate for the Harmons' § 1639(g) claim and it would be inequitable to now bar the Harmons from asserting it.

Accordingly, under the doctrine of equitable tolling, the Court holds that § 1640(e)'s one-year statute of limitations has not expired.

### b.  Lighthouse Violated TILA's § 1639(g)

Section 1639(g) provides that a "mortgage referred to in section 1602(aa) of this title may not include terms under which more than 2 periodic payments required under the loan are consolidated and paid in advance from the loan proceeds provided to the consumer."[26]  15 U.S.C. § 1639(g).  The Harmons paid 12 monthly interest payments in advance from the proceeds of the Lighthouse loan.  Accordingly, the Lighthouse loan violated § 1639(g)

Section 1640(a) provides, in relevant part, that a successful plaintiff "in the case of a failure to comply with any requirement under of this title, [is entitled to] an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material."[27]  15 U.S.C. § 1640(a)(4).

Section 1605(a) defines "finance charge":

> Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the

---

[26] As set forth above in Section 3, the Harmons' mortgage is covered by § 1602(aa).

[27] Section 1640(a)(1) provides that a plaintiff can recover actual damages for a TILA violation.  The Harmons have not incurred any actual damages (and also did not argue their entitlement to such damages in their post-trial briefs).  Section 1640(a)(3) provides that a plaintiff can recover reasonable legal fees and costs of the action.  The Harmons are entitled to an award of reasonable legal fees under § 1640(a)(3).  However, the Court previously reserved ruling on the Harmons' request for legal fees for a post-judgment hearing and will, therefore, not consider the amount of the Harmons' fees and costs at this time.

extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction. The finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges. Examples of charges which are included in the finance charge include any of the following types of charges which are applicable:

(1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.

(2) Service or carrying charge.

(3) Loan fee, finder's fee, or similar charge.

(4) Fee for an investigation or credit report.

(5) Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.

(6) Borrower-paid mortgage broker fees, including fees paid directly to the broker or the lender (for delivery to the broker) whether such fees are paid in cash or financed.

In the Harmons' Supplement to First Amended Complaint (ECF No. 63), the Harmons requested statutory damages arising from the following fees: (i) the $52,000.00 loan origination fee paid to Lighthouse, (ii) the $26,000.00 broker origination fee paid to the Harmons' mortgage broker, (iii) $12,500.00 in "Legal/Travel/Processing Fees" paid to Lighthouse, and (iv) "the $177,715.83 in prepaid interest plus all other interest that [Lighthouse] claims is due under the loan."[28]

---

[28] The Harmons also sought legal fees and costs. The Court will consider the amount of fees and costs to which Ms. Harmon's bankruptcy estate is entitled at a post-judgment hearing.

The Court finds that the Harmons are entitled to $268,215.83[29] in statutory damages under § 1640(a)(4).[30]   However, the Court gives Lighthouse credit for the $88,801.92 that Lighthouse transferred to the Harmons on July 8, 2008.[31]   After taking the $88,801.92 credit into account, the Harmons are awarded $179,413.91 in statutory damages under TILA.

### 4.  Lighthouse is not Liable for Fraud

The Harmons also claim that Lighthouse committed fraud by misrepresenting that it was able to provide them with a home equity loan and inducing the Harmons to enter into a loan transaction that Lighthouse knew violated Texas law.

The elements of fraud are: (1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without the knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.   *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990).

The Harmons' fraud claim fails to satisfy the first element of a claim for fraud.[32] Lighthouse accurately represented that it was not licensed to provide home equity loans in Texas

---

[29] $52,000.00 + $26,000.00 + $12,500.00 + $177,715.83 = $268,215.83.

The Court further notes that the Harmons are not entitled to statutory damages arising from the 6% interest rate on Lighthouse's equitably subrogated lien.  The 6% rate is imposed by Texas law and is therefore not a finance charge "imposed directly or indirectly by the creditor as an incident to the extension of credit" under § 1605(a).

[30] The Court notes that the Harmons may have been entitled to additional statutory damages arising from other finance charges and fees that were paid out of the proceeds of the loan.  However, the Harmons did not request any other statutory damages in their supplemental complaint.  Therefore, the Court declines to consider whether it should award additional statutory damages to the Harmons.

[31] *See* Pls.' Resp. to Def.'s Dec. 20, 2010 Brief 23, Jan. 12, 2011 ("the Harmons claim statutory damages equal to the finance charges paid by the Harmons, i.e., the $177,715.83 in prepaid interest less the amount returned to the Harmons . . . .").

[32] The Court need not apply the remaining elements in a fraud claim.

to the Harmons. Lighthouse also did not know that the straight rate loan they offered to the Harmons violated the Texas Constitution.

The Harmons' fraud claim is denied.

### 5. Lighthouse is not Liable for Deceptive Trade Practices

The Harmons pleaded numerous violations of the Texas Deceptive Trade Practices Act in their complaint but did not address the claims either at trial or in their post-trial briefs. The claims are based upon the Harmons' allegations that Lighthouse disguised what was, in substance, a home equity loan by representing it as a straight rate refinance loan. The Court has already determined that Lighthouse did not misrepresent the Harmons' loan or its inability to provide a home equity loan. Accordingly, the Court denies the Harmons' claims under the DTPA.

### 6. Lighthouse is not Liable for Conversion & Theft

The Harmons pleaded conversion and theft in their complaint but did not address the claims either at trial or in their post-trial briefs. There is no evidence that Lighthouse converted or stole property owned by the Harmons. Accordingly, the Court denies the Harmons' claims for conversion and theft.

### 7. Lighthouse is not Liable for Usury

The Harmons pleaded usury in their complaint but did not address the claim either at trial or in their post-trial briefs. Accordingly, the Court denies the Harmons' claim for usury.

### 8. Negligent Misrepresentation

The Harmons pleaded negligent misrepresentation in their complaint but did not address the claim either at trial or in their post-trial briefs. Accordingly, the Court denies the Harmons' claim for negligent misrepresentation.

**9.   Unreasonable Collection Practices & Negligent Debt Collection**

The Harmons pleaded unreasonable collection practices and negligent debt collection in their complaint but did not address the claims either at trial or in their post-trial briefs. Accordingly, the Court denies the Harmons' claims for unreasonable collection practices and negligent debt collection.

CONCLUSION

For the reasons set forth above, the Court holds:

1.   Lighthouse's lien on the Harmons' homestead is invalid;

2.   Lighthouse is equitably subrogated to the Fix Funding lien for the principal amount of $986,992.06 plus 6% interest (accrued from April 23, 2008)[33];

3.   Lighthouse must pay the Estate $179,413.91 in statutory damages under TILA;

4.   The Estate is entitled to reasonable legal fees and costs to be determined at a post-judgment hearing.

5.   All other relief is denied.

A separate judgment will be issued following the legal fees hearing.  The legal fees hearing will be on February 25, 2011 at 3:00 p.m.

SIGNED **February 17, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE

---

[33]  6% interest, compounded annually, will be calculated and included in the final judgment.